704 A.2d 1321

POP'S CONES, INC., T/A TCBY YOGURT, PLAINTIFF–
APPELLANT, v. RESORTS INTERNATIONAL HOTEL,
INC., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 28, 1997—Decided January 23, 1998.

Before Judges STERN, KLEINER and KIMMELMAN.

*Patrick M. Flynn* argued the cause for appellant (*Archer & Greiner*, attorneys; *Mr. Flynn* and *Steven J. Fram*, on the brief).

*John M. Donnelly* argued the cause for respondent (*Levine, Staller, Sklar, Chan, Brodsky & Donnelly*, attorneys; *Mr. Donnelly*, of counsel; *Brian J. Cullen*, on the brief).

The opinion of the court was delivered by

KLEINER, J.A.D.

Plaintiff, Pop's Cones, Inc., t/a TCBY Yogurt, ("Pop's"), appeals from an order of the Law Division granting defendant, Resorts International, Inc. ("Resorts"), summary judgment and dismissing

its complaint seeking damages predicated on a theory of promissory estoppel. Affording all favorable inferences to plaintiff's contentions, *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 536, 666 *A.*2d 146 (1995), we conclude that Pop's presented a *prima facie* claim sufficient to withstand summary dismissal of its complaint. *See R.* 4:46–2; *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146. In reversing summary judgment, we rely upon principles of promissory estoppel enunciated in Section 90 of the *Restatement (Second) of Contracts,* and recent cases which, in order to avoid injustice, seemingly relax the strict requirement of "a clear and definite promise" in making a *prima facie* case of promissory estoppel.

I

Pop's is an authorized franchisee of TCBY Systems, Inc. ("TCBY"), a national franchisor of frozen yogurt products. Resorts is a casino hotel in Atlantic City that leases retail space along "prime Boardwalk frontage," among other business ventures.

From June of 1991 to September 1994, Pop's operated a TCBY franchise in Margate, New Jersey. Sometime during the months of May or June 1994, Brenda Taube ("Taube"), President of Pop's, had "a number of discussions" with Marlon Phoenix ("Phoenix"), the Executive Director of Business Development and Sales for Resorts, about the possible relocation of Pop's business to space owned by Resorts.[1] During these discussions, Phoenix showed Taube one location for a TCBY vending cart within Resorts Hotel and "three specific locations for the operation of a full service TCBY store."

According to Taube, she and Phoenix specifically discussed the boardwalk property occupied at that time by a business trading as "The Players Club." These discussions included Taube's concerns

---

[1] The record on appeal is unclear as to who initiated these discussions.

with the then-current rental fees and Phoenix's indication that Resorts management and Merv Griffin personally[2] were "very anxious to have Pop's as a tenant" and that "financial issues ... could easily be resolved, such as through a percentage of gross revenue." In order to allay both Taube's and Phoenix's concerns about whether a TCBY franchise at The Players Club location would be successful, Phoenix offered to permit Pop's to operate a vending cart within Resorts free of charge during the summer of 1994 so as to "test the traffic flow." This offer was considered and approved by Paul Ryan, Vice President for Hotel Operations at Resorts.

These discussions led to further meetings with Phoenix about the Players Club location, and Taube contacted TCBY's corporate headquarters about a possible franchise site change. During the weekend of July 4, 1994, Pop's opened the TCBY cart for business at Resorts pursuant to the above stated offer. On July 6, 1994, TCBY gave Taupe initial approval for Pop's change in franchise site. In late July or early August of 1994, representatives of TCBY personally visited the Players Club location, with Taube and Phoenix present.

Based on Pop's marketing assessment of the Resorts location, Taube drafted a written proposal dated August 18, 1994, addressing the leasing of Resorts' Players Club location and hand-delivered it to Phoenix. Taube's proposal offered Resorts "7% of net monthly sales (gross less sales tax) for the duration of the [Player's Club] lease ... [and][i]f this proposal is acceptable, I'd need a 6 year lease, and a renewable option for another 6 years."

In mid-September 1994, Taube spoke with Phoenix about the status of Pop's lease proposal and "pressed [him] to advise [her] of Resorts' position. [Taube] specifically advised [Phoenix] that Pop's had an option to renew the lease for its Margate location and then needed to give notice to its landlord of whether it would

---

[2] Merv Griffin was the Chief Executive Officer and a large shareholder of Resorts.

be staying at that location no later than October 1, 1994." Another conversation about this topic occurred in late September when Taube "asked Phoenix if [Pop's] proposal was in the ballpark of what Resorts was looking for." He responded that it was and that "we are 95% there, we just need Belisle's [3] signature on the deal." Taube admits to having been advised that Belisle had "ultimate responsibility for signing off on the deal" but that Phoenix "assured [her] that Mr. Belisle would follow his recommendation, which was to approve the deal, and that [Phoenix] did not anticipate any difficulties." During this conversation, Taube again mentioned to Phoenix that she had to inform her landlord by October 1, 1994, about whether or not Pop's would renew its lease with them. Taube stated: "Mr. Phoenix assured me that we would have little difficulty in concluding an agreement and advised [Taube] to give notice that [Pop's] would not be extending [its] Margate lease and 'to pack up the Margate store and plan on moving.' "

Relying upon Phoenix's "advice and assurances," Taube notified Pop's landlord in late-September 1994 that it would not be renewing the lease for the Margate location.

In early October, Pop's moved its equipment out of the Margate location and placed it in temporary storage. Taube then commenced a number of new site preparations including: (1) sending designs for the new store to TCBY in October 1994; and (2) retaining an attorney to represent Pop's in finalizing the terms of the lease with Resorts.

By letter dated November 1, 1994, General Counsel for Resorts forwarded a proposed form of lease for The Players Club location to Pop's attorney. The letter provided:

> Per our conversation, enclosed please find the form of lease utilized for retail outlets leasing space in Resorts Hotel. You will note that there are a number of alternative sections depending upon the terms of the deal.

---

[3] The reference to Belisle is John Belisle, then-Chief Operating Officer of Resorts.

> As I advised, I will contact you ... to inform you of our decision regarding TCBY....

By letter dated December 1, 1994, General Counsel for Resorts forwarded to Pop's attorney a written offer of the terms upon which Resorts was proposing to lease the Players Club space to Pop's. The terms provided:

> [Resorts is] willing to offer the space for an initial three (3) year term with a rent calculated at the greater of 7% of gross revenues or: $50,000 in year one; $60,000 in year two; and $70,000 in year three ... [with] a three (3) year option to renew after the initial term ...

The letter also addressed a "boilerplate lease agreement" provision and a proposed addition to the form lease. The letter concluded by stating:

> *This letter is not intended to be binding upon Resorts.* It is intended to set forth the basic terms and conditions upon which Resorts would be willing to negotiate a lease and is subject to those negotiations and the execution of a definitive agreement
>
> ... [W]e think TCBY will be successful at the Boardwalk location based upon the terms we propose. We look forward to having your client as part of ... Resorts family of customer service providers and believe TCBY will benefit greatly from some of the dynamic changes we plan.
>
> ... [W]e would be pleased ... to discuss this proposal in greater detail. (emphasis added).

In early-December 1994, Taube and her attorney met with William Murtha, General Counsel of Resorts, and Paul Ryan to finalize the proposed lease. After a number of discussions about the lease, Murtha and Ryan informed Taube that they desired to reschedule the meeting to finalize the lease until after the first of the year because of a public announcement they intended to make about another unrelated business venture that Resorts was about to commence. Ryan again assured Taube that rent for the Players Club space was not an issue and that the lease terms would be worked out. "He also assured [Taube] that Resorts wanted TCBY ... on the boardwalk for the following season."

Several attempts were made in January 1995 to contact Resorts' representatives and confirm that matters were proceeding. On January 30, 1995, Taube's attorney received a letter stating: "This letter is to confirm our conversation of this date wherein I advised

that Resorts is withdrawing its December 1, 1994 offer to lease space to your client, TCBY." [4]

According to Taube's certification, "As soon as [Pop's] heard that Resorts was withdrawing its offer, we undertook extensive efforts to reopen [the] franchise at a different location. Because the Margate location had been re-let, it was not available." Ultimately, Pop's found a suitable location but did not reopen for business until July 5, 1996.

On July 17, 1995, Pop's filed a complaint against Resorts seeking damages. The complaint alleged that Pop's "reasonably relied to its detriment on the promises and assurances of Resorts that it would be permitted to relocate its operation to [Resorts'] Boardwalk location...."

After substantial pre-trial discovery, defendant moved for summary judgment. After oral argument, the motion judge, citing *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat. Bank,* 163 *N.J.Super.* 463, 395 *A.*2d 222 (App.Div.1978), *certif. denied,* 79 *N.J.* 488, 401 *A.*2d 243 (1979), rendered a detailed oral opinion in which he concluded, in part:

The primary argument of the defendant is that the plaintiff is unable to meet the requirements for a claim of Promissory Estoppel as there was no clear and definite promise ever made to plaintiff; and, therefore, any reliance on the part of plaintiff upon the statements of the Resorts agent were not reasonable.

. . .

... I think that even if a jury would find that a lease was promised, there was lack of specificity in its terms so as to not rise to the level of what is necessary to meet the first element for Promissory Estoppel.

There was no specificity as to the term of this lease. There was no specificity as to the starting date of this lease. There was no specificity as to the rent, although it was represented that rent would not be a problem. Rent had not been agreed upon, and it is not certified that it had been agreed upon. When they left that

---

[4] Apparently, in late January 1995, Resorts spoke with another TCBY franchise, Host Marriott, regarding the Players Club's space. Those discussions eventually led to an agreement to have Host Marriott operate a TCBY franchise at the Players Club location. That lease was executed in late May 1995, and TCBY opened shortly thereafter.

meeting, according to ... plaintiff's own facts, they didn't have a lease; they would still have to work out the terms of the lease. It was not in existence at the time.

. . .

... We don't have facts in dispute. Neither side, neither the defendant nor the plaintiff, can attest to the terms of the lease, of the essential terms of the lease or still not agreed upon at the time of that the meeting was over in December of 1994.

Based on *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146, the judge concluded that the evidence was so one-sided that defendant was entitled to prevail as a matter of law.

It is quite apparent from the motion judge's reasons that he viewed plaintiff's complaint as seeking enforcement of a lease which had not yet been fully negotiated. If that were plaintiff's intended remedy, we would agree with the judge's conclusion. However, plaintiff's complaint, after reciting the facts from the inception of Taube's initial contact with defendant until January 30, 1995, stated:

19. As a result of its reasonable reliance on the promises and assurances made to it by Resorts, Pop's has been significantly prejudiced and has suffered significant damages, including the following:

a. the loss of its Margate location and its ability to earn profits during the 1995 summer season;

b. out-of-pocket expenses, including attorney's fees; and

c. out-of-pocket expenses in attempting to locate an alternate location.

Wherefore, Pop's demands judgment against defendant, Resorts International Hotel, Inc., for damages, costs of suit and for other and further legal and equitable relief as the Court may deem just and proper.

It seems quite clear from plaintiff's complaint that plaintiff was not seeking damages relating to a lease of the boardwalk property, but rather was seeking damages flowing from its reliance upon promises made to it prior to October 1, 1994, when it failed to renew its lease for its Margate location. Thus, plaintiff's claim was predicated upon the concept of promissory estoppel and was not a traditional breach of contract claim.

The doctrine of promissory estoppel is well-established in New Jersey. *Malaker, supra,* 163 *N.J.Super.* at 479, 395 *A.*2d 222 ("Suffice it to say that given an appropriate case, the doctrine [of promissory estoppel] will be enforced."). A promissory estoppel

claim will be justified if the plaintiff satisfies its burden of demonstrating the existence of, or for purposes of summary judgment, a dispute as to a material fact with regard to, four separate elements which include:

> (1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise, and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise.
>
> [<i>Ibid.</i>]

The essential justification for the promissory estoppel doctrine is to avoid the substantial hardship or injustice which would result if such a promise were not enforced. *Id.* at 484, 395 *A.*2d 222.

In *Malaker,* the court determined that an implied promise to lend an unspecified amount of money was not "a clear and definite promise" justifying application of the promissory estoppel doctrine. *Id.* at 478–81, 395 *A.*2d 222. Specifically, the court concluded that the promisor-bank's oral promise in October 1970 to lend $150,000 for January, February and March of 1971 was not "clear and definite promise" because it did not describe a promise of "sufficient definition." *Id.* at 479, 395 *A.*2d 222.

It should be noted that the court in *Malaker* seems to have heightened the amount of proof required to establish a "clear and definite promise" by searching for "*an express promise* of a 'clear and definite' nature." *Id.* at 484, 395 *A.*2d 222 (emphasis added). This sort of language might suggest that New Jersey Courts expect proof of most, if not all, of the essential legal elements of a promise before finding it to be "clear and definite."

Although earlier New Jersey decisions discussing promissory estoppel seem to greatly scrutinize a party's proofs regarding an alleged "clear and definite promise by the promisor," *see, e.g., id.* at 479, 484, 395 *A.*2d 222, as a prelude to considering the remaining three elements of a promissory estoppel claim, more recent decisions have tended to relax the strict adherence to the *Malaker* formula for determining whether a *prima facie* case of promissory estoppel exists. This is particularly true where, as here, a plaintiff does not seek to enforce a contract not fully negotiated, but

instead seeks damages resulting from its detrimental reliance upon promises made during contract negotiations despite the ultimate failure of those negotiations.

In *Peck v. Imedia, Inc.*, 293 *N.J.Super.* 151, 679 *A.*2d 745 (App.Div.) *certif. denied,* 147 *N.J.* 262, 686 *A.*2d 763 (1996), we determined that an at-will employment contract offer was a "clear and definite promise" for purposes of promissory estoppel. *See id.* at 165–68, 679 *A.*2d 745. The employment contract offer letter contained the position title, a "detailed position description ... as well as information on ... benefits" and an annual salary. *Id.* at 156, 679 *A.*2d 745. We recognized that even though an employer can terminate the employment relationship at any time, there may be losses incident to reliance upon the job offer itself. *Id.* at 167–68, 679 *A.*2d 745. *See also Mahoney v. Delaware McDonald's Corp.*, 770 *F.*2d 123, 127 (8th Cir.1985) (holding that plaintiff's purchase of property for lease to defendant in reliance upon defendant's representation that "[w]e have a deal" created cause of action for promissory estoppel); *Bercoon, Weiner, Glick & Brook v. Manufacturers Hanover Trust Co.*, 818 *F.Supp.* 1152, 1161 (N.D.Ill.1993) (holding that defendant's representation that lease was "done deal" and encouragement of plaintiff to terminate existing lease provided plaintiff with cause of action for promissory estoppel).

Further, the *Restatement (Second) of Contracts* § 90 (1979), "Promise Reasonably Inducing Action or Forbearance," provides, in pertinent part:

> (1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding *if injustice can be avoided only by enforcement of the promise.* The remedy granted for breach may be limited as justice requires.
>
> *[Ibid.* (emphasis added).]

The *Restatement* approach is best explained by illustration 10 contained within the comments to Section 90, and based upon *Hoffman v. Red Owl Stores, Inc.*, 26 *Wis.*2d 683, 133 *N.W.*2d 267 (1965):

10. A, who owns and operates a bakery, desires to go into the grocery business. He approaches B, a franchisor of supermarkets. B states to A that for $18,000 B will establish A in a store. B also advises A to move to another town and buy a small grocery to gain experience. A does so. Later B advises A to sell the grocery, which A does, taking a capital loss and foregoing expected profits from the summer tourist trade. B also advises A to sell his bakery to raise capital for the supermarket franchise, saying "Everything is ready to go. Get your money together and we are set." A sells the bakery taking a capital loss on this sale as well. Still later, B tells A that considerably more than an $18,000 investment will be needed, and the negotiations between the parties collapse. At the point of collapse many details of the proposed agreement between the parties are unresolved. The assurances from B to A are promises on which B reasonably should have expected A to rely, and A is entitled to his actual losses on the sales of the bakery and grocery and for his moving and temporary living expenses. Since the proposed agreement was never made, however, A is not entitled to lost profits from the sale of the grocery or to his expectation interest in the proposed franchise from B.

[*Restatement (Second) of Contracts* § 90 cmt. d, illus. 10 (1979).]

We particularly note our recent discussion in *Mazza v. Scoleri,* 304 *N.J.Super.* 555, 701 *A.*2d 723 (App.Div.1997). Although *Mazza* did not focus on the issue of promissory estoppel, it expressly adopted the exception to the Statute of Frauds enunciated in *Restatement (Second) of Contracts,* § 139(1) (1979). *Mazza, supra,* 304 *N.J.Super.* at 560, 701 *A.*2d 723. That section provides:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is limited as justice requires.

[*Restatement (Second) of Contracts* § 139(1) (1979).]

*Mazza* also instructs, citing *Citibank v. Estate of Simpson,* 290 *N.J.Super.* 519, 530, 676 *A.*2d 172 (App.Div.1996), that "New Jersey typically gives considerable weight to *Restatement* views, and has, on occasion, adopted those views as the law of this State when they speak to an issue our courts have not yet considered." *Mazza,* 304 *N.J.Super.* at 560, 701 *A.*2d 723 (citations omitted).

It is thus quite clear that Section 90 of the *Restatement* complements the exception to the Statute of Frauds discussed in Section 139(1).

As we read the *Restatement,* the strict adherence to proof of a "clear and definite promise" as discussed in *Malaker* is being eroded by a more equitable analysis designed to avoid injustice. This is the very approach we adopted in *Peck, supra,* wherein even in the absence of a clear and definite contract of employment, we permitted the plaintiff to proceed with a cause of action for damages flowing from plaintiff's losses based on her detrimental reliance on the promise of employment. 293 *N.J.Super.* at 168, 679 *A.*2d 745.

■ The facts as presented by plaintiff by way of its pleadings and certifications filed by Taube, which were not refuted or contradicted by defendant before the motion judge or on appeal, clearly show that when Taube informed Phoenix that Pop's option to renew its lease at its Margate location had to be exercised by October 1, 1994, Phoenix instructed Taube to give notice that it would *not* be extending the lease. According to Phoenix, virtually nothing remained to be resolved between the parties. Phoenix indicated that the parties were "95% there" and that all that was required for completion of the deal was the signature of John Belisle. Phoenix assured Taube that he had recommended the deal to Belisle, and that Belisle would follow the recommendation. Phoenix also advised Pop's to "pack up the Margate store and plan on moving."

It is also uncontradicted that based upon those representations that Pop's, in fact, did not renew its lease. It vacated its Margate location, placed its equipment and personalty into temporary storage, retained the services of an attorney to finalize the lease with defendant, and engaged in planning the relocation to defendant's property. Ultimately, it incurred the expense of relocating to its present location. That plaintiff, like the plaintiff in *Peck,* relied to its detriment on defendant's assurances seems unquestionable; the facts clearly at least raise a jury question. Additionally, whether plaintiff's reliance upon defendant's assurances was reasonable is also a question for the jury.

Conversely, following the Section 90 approach, a jury could conclude that Phoenix, as promisor, should reasonably have expected to induce action or forbearance on the part of plaintiff to his precise instruction *"not* to renew the lease" and to "pack up the Margate store and plan on moving." In discussing the "character of reliance protected" under Section 90, comment b states:

> The principle of this Section is flexible. The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant. . .

[*Restatement (Second) of Contracts* § 90 cmt. b (1979) (citations omitted).]

Plaintiff's complaint neither seeks enforcement of the lease nor speculative lost profits which it might have earned had the lease been fully and successfully negotiated. Plaintiff merely seeks to recoup damages it incurred, including the loss of its Margate leasehold, in reasonably relying to its detriment upon defendant's promise. Affording plaintiff all favorable inferences, its equitable claim raised a jury question. *See Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146. Plaintiff's complaint, therefore, should not have been summarily dismissed.

Reversed and remanded for further appropriate proceedings.