815 A.2d 1013 (2003)
357 N.J. Super. 488
James LOBIONDO, Plaintiff-Respondent,
v.
Liam O'CALLAGHAN, Defendant-Appellant, and
John Mulheren, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued December 4, 2002.
Decided February 19, 2003.
*1014 Paul H. Schneider, Middletown, argued the cause for appellant (Giordano, Halleran & Ciesla, attorneys; Mr. Schneider, on the brief).
Thomas J. Hirsch, Ocean, argued the cause for respondent.
Before Judges WEFING, WECKER and FUENTES.
The opinion of the court was delivered by WEFING, J.A.D.
Defendant, Liam O'Callaghan, appeals from a judgment granting specific performance to plaintiff, James LoBiondo. We *1015 reverse and remand for entry of judgment in favor of defendant.

I.
O'Callaghan and his wife, Robin, together own a house located at 850 Ocean Avenue in Sea Bright. The property is across the street from the ocean and the rear abuts the Shrewsbury River. The O'Callaghans also own a house in Princeton, where Mrs. O'Callaghan works for Educational Testing Service. Their two sons attended Christian Brothers Academy (CBA) in Lincroft and Mr. O'Callaghan lived at the Sea Bright house during the week with the boys because it was closer to their school as well as closer to his work. Mrs. O'Callaghan stayed in Princeton because it was closer to her work. The family would reunite on weekends, sometimes in Sea Bright, more often in Princeton. The family resided together in Sea Bright during the summer.
Various neighbors had, over the years, indicated to O'Callaghan an interest in buying the house if he ever decided to sell. During these discussions, O'Callaghan consistently replied that he would not sell the house until his youngest son had graduated from CBA, an event scheduled to occur in 2001. Neighbors who had expressed an interest in the property included Mr. O'Shea, who owned the property next door to O'Callaghan, Mr. DeSio, who lived a few houses down the street, and Mr. Chimento, who owned a beach club further up Ocean Avenue.
Plaintiff LoBiondo owns the Surfrider Beach Club that is diagonally across Ocean Avenue from the O'Callaghan home. He was particularly interested in buying the property, both to provide a residence for his son, James, who managed the beach club, and to provide additional parking for the business. LoBiondo maintained that as a result of his discussions with Mr. O'Callaghan, he at first had an oral contract for the purchase of the house that was later transformed into an oral right of first refusal. Defendant O'Callaghan denied any such agreement.
Discussions between O'Callaghan and LoBiondo commenced in 1996 and spanned several years. Nothing was ever reduced to writing between the two. Mrs. O'Callaghan, despite being a joint owner, took no part in these discussions. The trial court, after a four-day bench trial, found for plaintiff.
According to LoBiondo, the two men met in the winter of 1998-1999 to discuss a possible sale. During the meeting, they discussed the condition of the property and the fact that the bulkhead was in need of extensive repair. LoBiondo said they agreed at this meeting that the property was worth approximately $280,000. LoBiondo also testified that during this meeting, O'Callaghan said he could not agree then to sell the property to LoBiondo because he had already promised Chimento the first opportunity to buy.
LoBiondo said the two next met in late 1999 or early 2000; by that time O'Callaghan knew that Chimento was no longer interested in buying the O'Callaghan home. LoBiondo said he told O'Callaghan in April 2000 that for business reasons he would like to buy the property in 2000 but that he would permit O'Callaghan to remain in the house until his son finished high school. LoBiondo maintained that O'Callaghan was willing to sell on those terms. He said the two had further discussions on price and agreed $300,000 was a fair price.
LoBiondo said he told O'Callaghan that another nearby neighbor, Guch, was planning to sell his house and that he, LoBiondo, would buy that house if O'Callaghan did not want to sell in 2000. O'Callaghan *1016 responded by producing a survey of his property to demonstrate to LoBiondo why his property would be superior, for LoBiondo's purposes, to Guch's.
LoBiondo said he wanted to commence repairs on the bulkhead and demolish a wall on the property which would permit him both greater access to the bulkhead and facilitate the parking of cars. LoBiondo testified O'Callaghan was agreeable to both proposals and LoBiondo secured a number of estimates on having the bulkhead repaired. When LoBiondo settled on the contractor, he wanted a deposit before proceeding to request the necessary permits. LoBiondo said he called O'Callaghan to make sure they still had a deal and O'Callaghan said they did.
LoBiondo planned to begin demolishing the wall on Monday, June 19, 2000. Mrs O'Callaghan learned of this on June 18 and immediately objected. She also insisted that the couple list the property with a real estate broker to see if they would realize more on the sale.
O'Callaghan went across the street to inform LoBiondo of his wife's position. LoBiondo said he was chagrined but did not insist that the two had a contract for $300,000. He said he did not want O'Callaghan in the future to feel he had sold at too low a price. LoBiondo said that O'Callaghan promised he would give LoBiondo the opportunity to match any offer that was received and that he would put into the listing contract a provision that LoBiondo could purchase the property without a commission.
O'Callaghan later returned to LoBiondo and told him that he and his wife had listed the property with a local broker for $425,000. Both O'Callaghan and LoBiondo felt that price was unrealistic. O'Callaghan further told LoBiondo that while the realtor had refused to include within the listing agreement a provision relieving LoBiondo from the scope of her commission, she had said that if LoBiondo bought the property within a week she would not charge a commission.
The O'Callaghans signed the listing agreement on July 26, 2000. On August 6, the realtor called to tell them she had received an offer to pay the full asking price, with no contingencies. They agreed to meet the following day to sign the contract.
Mr. and Mrs. O'Callaghan were in Princeton and had to drive from there to the broker's office. On August 7, they did not proceed directly to the broker's office, however, for Mr. O'Callaghan wanted to stop in Sea Bright to talk to the various neighbors who had expressed an interest in the property over the years.
He first tried to reach Mr. O'Shea, his next door neighbor, but he was unsuccessful in contacting O'Shea. He did talk to Mr. DeSio and told him of the $425,000 offer. DeSio was a builder who had intended on knocking down the existing house and building a new one; he did not think the property was worth that much and simply congratulated O'Callaghan on receiving such a large offer.
O'Callaghan then walked across the street to LoBiondo's beach club. He met LoBiondo and told him of the $425,000 offer. LoBiondo was surprised at the size of the offer and, according to his testimony, asked for time to consult with his wife whether to match the offer but O'Callaghan refused, saying they were on their way to the real estate agent's. O'Callaghan, on the other hand, testified that LoBiondo did not ask for time to talk to his wife but only asked for the return of the deposit he had given to the bulkhead contractor. The trial court found LoBiondo's version credible and rejected O'Callaghan's testimony in this regard.
*1017 LoBiondo called O'Callaghan the following day and said he was prepared to match the offer and would offer an additional $25,000. O'Callaghan, despite the threeday attorney review provision in the contract, said it was too late because he had already signed the contract.
LoBiondo then began this action, naming as defendants O'Callaghan and the offeror, John Mulheren, who happened to own the property directly across the river from O'Callaghan. The trial court restrained the sale of the property pending trial. Plaintiff did not join as a defendant Mrs. O'Callaghan, who was a joint owner of 850 Ocean Avenue.
At the conclusion of the trial, the court issued a twenty-three page written decision in which it found that O'Callaghan had granted LoBiondo a right of first refusal, that the right was enforceable, and that Mrs. O'Callaghan had authorized Mr. O'Callaghan to act on her behalf in connection with the property. Within its opinion, the trial court specifically refused to rest its decision on the doctrine of promissory estoppel, the alternate basis to plaintiff's claim for relief. Pop's Cones v. Resorts Intern. Hotel, 307 N.J.Super. 461, 704 A.2d 1321 (App.Div.1998); Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat. Bank, 163 N.J.Super. 463, 395 A.2d 222 (App.Div.1978), certif. denied, 79 N.J. 488, 401 A.2d 243 (1979).
O'Callaghan raises, essentially, three points on appeal: that the evidence was insufficient to permit the trial court to find an enforceable right of first refusal, that even if LoBiondo had such a right of first refusal, he lost it by not exercising it when first told of the Mulheren offer, and the trial court erred by entering an order compelling him to sell to LoBiondo. We agree with O'Callaghan's first argument and, accordingly, reverse.
There is no essential dispute on the standard of review which we are called upon to utilize in considering this matter. We will not interfere with the trial court's findings of fact to the extent they find support within the record. State v. Locurto, 157 N.J. 463, 470, 724 A.2d 234 (1999); Abtrax Pharmaceuticals, Inc. v. Elkins-Sinn, Inc., 139 N.J. 499, 655 A.2d 1368 (1995). The trial court's conclusions of law, however, are not entitled to such deference; they are subject to plenary review. Manalapan Realty v. Township Committee, 140 N.J. 366, 658 A.2d 1230 (1995).

II.
Until recently, New Jersey followed the historical common law rule that oral agreements to transfer an interest in real property were unenforceable under the Statute of Frauds. In 1996, however, the Legislature substantially amended the statute and provided that such oral agreements could be enforceable if proven by clear and convincing evidence. N.J.S.A. 25:1-13(b). Prant v. Sterling, 332 N.J.Super. 369, 378, 753 A.2d 758 (Ch.Div.1999), aff'd, 332 N.J.Super. 292, 753 A.2d 715 (App.Div. 2000).
The parties at trial did not factually dispute much of what occurred between LoBiondo and O'Callaghan. The one clear area of dispute related to LoBiondo's initial reaction upon hearing of the $425,000 offer. As we noted earlier, the trial court accepted LoBiondo's testimony in that regard and that credibility assessment is binding upon us.
The parties did, however, dispute the legal significance of what transpired between the two men. Having reviewed the record in detail, we consider the critical issue on appeal to be the relationship of Mrs. O'Callaghan to this transaction. The trial court concluded that Mrs. O'Callaghan *1018 acted as to vest her husband with apparent authority in his dealings with LoBiondo; it is in this conclusion that we are satisfied the trial court erred in two respects.

A.
Within its letter opinion, the trial court carefully noted that plaintiff was required to prove the existence of a right of first refusal by clear and convincing evidence but was only required to prove the remaining aspects of his case by a preponderance of the evidence. To the extent that the trial court concluded that plaintiff did not have to prove by clear and convincing evidence that Mr. O'Callaghan had apparent authority, the trial court erred.
In O'Reilly v. Keim, 54 N.J. Eq. 418, 34 A. 1073 (E. & A. 1896), the Court of Errors and Appeal held that while parol evidence could prove an agent's authority to bind his principal for the sale of real estate, the evidence had to be "clear and decisive" on the point. There has been no retreat from that principle since. Nothing within the 1996 amendments to the Statute of Frauds indicates that the Legislature intended to lessen the burden of proving the existence or scope of an agent's authority by parol evidence. Rather, it would only be logical, if clear and convincing evidence is required to prove the existence of an oral agreement relating to the sale of real estate, to continue the requirement that the agent's authority be proven by "clear and decisive" proof. It would be counter to the thrust of the amended statute of frauds, in our judgment, if preponderance of the evidence was a sufficient evidential basis to find apparent authority.
That is particularly so in the context of this case, in which Mrs. O'Callaghan was an equal owner of the property. To permit a finding of apparent authority based upon a preponderance of the evidence would have the result of finding an enforceable oral contract with her on the preponderance of the evidence, rather than the statutorily mandated clear and convincing evidence.

B.
We have reviewed the record in this matter in great detail to determine whether plaintiff could be considered to have demonstrated by clear and convincing evidence that Mr. O'Callaghan had apparent authority from Mrs. O'Callaghan to enter into an enforceable agreement for this property. If the evidence presented during trial was clear and convincing, the trial court's reference to a preponderance of the evidence would be deemed harmless error. We are satisfied, however, that plaintiff's evidence cannot meet the clear and convincing threshold and that the reasons given by the trial court to support its conclusion that Mrs. O'Callaghan had vested her husband with apparent authority are legally insufficient.
"Apparent authority arises when a principal `acts in such a manner as to convey the impression to a third party that the agent has certain power which he may or not possess.' " Rodriguez v. Hudson County Collision Co., 296 N.J.Super. 213, 220, 686 A.2d 776 (App.Div.1997). "Liability will be imposed upon the principal in cases involving apparent authority where the actions of a principal have misled a third party into believing that a relationship of authority existed." Id. at 221, 686 A.2d 776.
Under the doctrine of apparent authority,
[t]he principal is bound by the acts of his agent within the apparent authority which he knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. The question *1019 in every case depending upon the apparent authority of the agent is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question.... [Legge, Ind. v. Kushner Hebrew Acad., 333 N.J.Super. 537, 560, 756 A.2d 608 (App.Div.2000) (quoting American Well Works v. Royal Indemnity Co., 109 N.J.L. 104, 108, 160 A. 560 (E. & A.1932)).]
Thus, a conclusion that a party has acted with apparent authority must rest upon the actions of the principal, not the alleged agent. Wilzig v. Sisselman, 209 N.J.Super. 25, 35, 506 A.2d 1238 (App.Div.1986).
The trial court cited six reasons for its conclusion that Mr. O'Callaghan had apparent authority to negotiate an enforceable agreement with LoBiondo: (1) he spent more time at the property than did his wife; (2) he had held numerous discussions with LoBiondo over the years about the property; (3) there was no evidence Mr. O'Callaghan ever told LoBiondo that he did not speak for his wife or that would have given LoBiondo reason to doubt O'Callaghan's authority; (4) the only time Mr. O'Callaghan mentioned his wife to LoBiondo was when he said she insisted on listing the property with a broker; (5) Mrs. O'Callaghan testified that when her husband went to LoBiondo on August 7 to inform him of the offer, he was authorized to speak for her; and (6) Mrs. O'Callaghan never told anyone her husband acted without her authority.
The first three factors are immaterial to the question of Mr. O'Callaghan's apparent authority for they are actions of Mr. O'Callaghan, the alleged agent, not Mrs. O'Callaghan, the alleged principal. Wilzig v. Sisselman, supra.
The same analysis applies to the fourth factor. This factor, moreover, evidences Mrs. O'Callaghan's unwillingness to let her husband handle the sale of this property. The only reasonable conclusion LoBiondo could have drawn from being told that Mrs. O'Callaghan wanted the property listed with a real estate broker and refused to have the wall taken down would be that Mr. O'Callaghan did not speak for his wife in these matters.
The fifth factor, Mrs. O'Callaghan's testimony that her husband was authorized to speak for her on August 7 when he went to LoBiondo, is also legally insufficient to support a finding of apparent authority because the trial court found that the oral contract for a right of first refusal was entered into, not on August 7, but some time earlier, when O'Callaghan told LoBiondo his wife insisted on listing the property with a broker.
Nor can Mrs. O'Callaghan's testimony to this effect be considered a ratification on her part for there is no testimony that Mrs. O'Callaghan ever knew that her husband had purported to convey a right of first refusal to LoBiondo and Mrs. O'Callaghan specifically denied such knowledge. Passaic-Bergen Lumber Co. v. U.S. Trust Co., 110 N.J.L. 315, 318, 164 A. 580 (E. & A.1933) ("In order that ratification may be shown, it is incumbent on defendant to prove that the plaintiff had full knowledge of all the material facts."); MacLeod v. Ajax Distributing Co., 22 N.J.Super. 121, 127, 91 A.2d 635 (App.Div.1952) ("To ratify means to approve and sanction. It presupposes knowledge or at least some alerting circumstantial information of the unauthorized action.").
The sixth factor, that Mrs. O'Callaghan never testified her husband acted without her authority, is also insufficient for it has *1020 the effect of placing the burden of proof on defendant to disprove authority, rather than upon plaintiff, who is asserting its existence. Mrs. O'Callaghan did testify, moreover, that she expected to be consulted before there would ever be a final deal for the sale of the house she jointly owned.

III.
Plaintiff argues that the judgment of the trial court should be affirmed under the principles of promissory estoppel. We disagree.
There are four elements to the doctrine of promissory estoppel: 1) a clear and definite promise, 2) made with the expectation that the promisee will rely upon it, 3) reasonable reliance upon the promise, 4) which results in definite and substantial detriment. Malaker Corp. Stockholders Protective Committee v. First Jersey Nat'l Bank, 163 N.J.Super. 463, 479, 395 A.2d 222 (App.Div.1978) (holding, inter alia, that an alleged oral promise by a bank to provide additional loans to a creditor was unenforceable under principles of promissory estoppel).
This court has recently indicated that in certain contexts the party invoking the doctrine of promissory estoppel need not provide "clear and definite" proof of such an express promise. Pop's Cones v. Resorts Intern. Hotel, supra, 307 N.J.Super. at 469, 704 A.2d 1321 (plaintiff, who held a franchise to sell yogurt products, established a prima facie case for damages when defendant withdrew its oral promise to lease space to plaintiff and plaintiff had surrendered its lease at its original location in reliance on that promise). We carefully pointed out, however, that plaintiff in that case was seeking damages relating to the surrender of its location, not damages based upon losing a location on the Boardwalk. We said, "This [permitting a party to proceed without `clear and definite' proof] is particularly true where, as here, a plaintiff does not seek to enforce a contract not fully negotiated, but instead seeks damages resulting from its detrimental reliance upon promises made during contract negotiations despite the ultimate failure of those negotiations." Id. at 469-70, 704 A.2d 1321. Here, however, plaintiff is attempting to utilize the theory of promissory estoppel to obtain specific performance of the alleged contract at issue.
Plaintiff having failed to prove his claim by clear and convincing evidence was not entitled to a judgment for specific performance and we reverse the order for judgment and remand this matter for entry of a judgment in favor of defendant.