**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3149-16T3

SDK TROY TOWERS, LLC,

     Plaintiff-Appellant,

v.

TROY TOWERS, INC.,

     Defendant-Respondent.

_____

Argued January 15, 2019 – Decided February 14, 2019

Before Judges Fisher, Suter and Firko.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-0011-16.

Joseph B. Fiorenzo argued the cause for appellant (Sills Cummis & Gross, PC, attorneys; Joseph B. Fiorenzo, on the brief).

Michael J. Canning argued the cause for respondent (Giordano, Halleran & Ciesla, PC, attorneys; Michael J. Canning, of counsel and on the brief; Matthew N. Fiorovanti, on the brief).

PER CURIAM

Plaintiff SDK Troy Towers, LLC, commenced this chancery action, seeking specific performance and alleging its written and oral communications with defendant Troy Towers, Inc. – for the purchase from defendant of an apartment complex in Bloomfield for $45,000,000[1] – evolved into an enforceable contract. Defendant secured dismissal through a series of summary judgment motions, elucidating that the communications of these sophisticated parties[2] demonstrated without doubt that they both well understood neither would be bound absent a fully-executed and delivered written contract – an event that never occurred. Because the motion judges correctly determined that the evidence, when viewed in plaintiff's favor, was "so one-sided" that plaintiff could not prevail at trial, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995), we affirm.

I

This suit was commenced in the Chancery Division in March 2012. The original complaint alleged breach of contract, promissory estoppel, breach of

---

[1] The property consists of 356 units contained within two sixteen-story towers.

[2] Plaintiff is an entity in the business of owning and managing apartment buildings; its principals are Dinesh Khosla, a law professor, and his wife, Savita Khosla, a physician. Defendant is owned by a holding company, Ayson Realty Corporation, which is owned by a family trust.

the implied covenant of good faith and fair dealing, and fraud, and sought specific performance and damages. After a considerable discovery period, defendant moved for partial summary judgment. By way of a November 20, 2015 written opinion, Judge Donald A. Kessler granted the motion in part; he dismissed the breach-of-contract claim, rejected plaintiff's request for specific performance, and discharged a notice of lis pendens on the property. The judge denied the motion in part and transferred the action to the Law Division.

Defendant later moved for summary judgment on the remaining claims. In an April 27, 2016 written opinion, Judge Thomas R. Vena granted defendant's motion on the fraud and good-faith-and-fair-dealing claims but denied relief on the promissory-estoppel claim. He also denied defendant's reconsideration motion on the promissory-estoppel claim, and we denied defendant's motion for leave to appeal the judge's decision on the promissory-estoppel claim.

After further discovery, defendant again moved for summary judgment on the promissory-estoppel claim. Judge Vena granted that motion for reasons set forth in a February 17, 2017 written opinion. A few days prior to that decision, plaintiff moved for reconsideration of the dismissal of its fraud claim and for leave to file an amended complaint alleging negligent misrepresentation. That motion was denied for reasons expressed in a March 3, 2017 written opinion.

## II

Plaintiff appeals, arguing, among other things, that the motion judges "usurped the function of the jury" and mistakenly "evaluat[ed] the evidence on critical fact questions," most notably drawing conclusions about the parties' intentions.[3] We disagree. The evidence so one-sidedly demonstrates that neither party believed either would be bound absent a formal, fully-executed, and delivered written contract, that defendant was entitled to summary judgment on all plaintiff's pleaded and unpleaded[4] causes of action.

In reviewing dispositions by way of summary judgment, we employ the same Brill standard trial courts are obligated to apply. Petro-Lubricant Testing Labs., Inc. v. Adelman, 233 N.J. 236, 256-57 (2018). Accordingly, while we affirm substantially for the well-reasoned opinions of Judges Kessler and Vena,

---

[3] We recognize that plaintiff's arguments are not so simple or limited. Instead, we allowed the parties to file overlength briefs. Their excellent submissions contain numerous other contentions. But, the central theme of plaintiff's arguments is the assertion that the motion judges did not honor the summary-judgment standard when they dismissed plaintiff's various legal and equitable theories.

[4] Plaintiff moved at the eleventh hour to file an amended complaint to include a negligent-misrepresentation claim. As explained in Section V of this opinion, the motion judge correctly denied leave to amend because that claim also would have been dismissed by way of summary judgment.

we nevertheless discuss at some length the factual allegations and the legal principles that fully warranted the disposition of plaintiff's claims.

III

In May 2011, defendant retained Cushman and Wakefield to broker a sale of the Bloomfield property, which defendant acquired in the late 1960s or early 1970s for about $3,500,000. Because the potential tax consequences of the sale were enormous, defendant desired to engage in a 1031 exchange[5] and so advised Cushman and Wakefield; that aspect formed a material part of defendant's agreement with Cushman and Wakefield.[6]

Brian Whitmer of Cushman and Wakefield handled the marketing for defendant, and Josh Allen, Ayson's chief operations officer, was his primary

---

[5] 26 U.S.C. § 1031 permits an investor to sell a property, reinvest the proceeds in a new property, and defer all capital gain taxes.

[6] Defendant's agreement with Cushman and Wakefield stipulated that if they were "unable to identify an exchange of the Premises pursuant to Section 1031" defendant could "elect not to proceed with this Agreement or the transactions contemplated [t]hereunder."

5

contact. Whitmer's primary contacts for plaintiff were Dinesh Khosla and his nephew, Raman Khosla.[7]

In June 2011, Whitmer disseminated an offering memorandum. Plaintiff reached out for additional information, and, after Raman Khosla executed a confidentiality agreement, Whitmer provided plaintiff with access to an online due-diligence database about the property.

Dinesh and Raman Khosla visited the property with Whitmer on July 13, 2011. The next day, plaintiff submitted an offer to purchase for $40,700,000; plaintiff expressly stated that the offer "[wa]s not contractually binding on the parties" but "only an expression of the basic terms and conditions to be incorporated into a formal written agreement." In expressing a common theme throughout the parties' communications, the written offer declared that "[t]he parties shall not be contractually bound unless and until they execute a form of contract which contract shall be in form and content satisfactory to each party and its counsel in their sole discretion" and that "[n]either party may rely on this letter as creating any legal obligation of any kind." Raman Khosla testified at his deposition that it was plaintiff's practice to have written and signed contracts

---

[7] Like Dinesh and Savita Khosla, plaintiff's principals, Raman Khosla also had considerable sophistication and knowledge in this arena. He has a bachelor's degree in computer science and an MBA in finance.

for the acquisition of properties, and he understood that here – without a written, signed, and delivered contract – no obligation to close would be imposed.

In its offer, plaintiff also acknowledged defendant's interest in pursuing a 1031 exchange:

> We recognize that the seller may be interested in a 1031 exchange. We are open to discussing a time frame to accommodate that need. However, we want to emphasize that our offer is based on current levels of financing and interest rates (we have a soft quote from one of our potential lender [sic]).

The offer letter also recognized that plaintiff was obligated to pay its own "legal fees, costs of due diligence, fee title insurance, and survey," whether or not a closing ever occurred.

Plaintiff received no response but nevertheless performed some due diligence. On August 12, 2011, plaintiff submitted a second offer to purchase for $40,700,000, which included the same language from the first offer about a need for a written contract, defendant's interest in a 1031 exchange, and the buyer's obligation to bear its own costs.

On August 16, 2011, Whitmer emailed plaintiff and other prospective purchasers. He explained to plaintiff that he had scheduled a call with defendant to discuss its offer but did not believe its prior offers were high enough and,

therefore, had decided to bid the property at market. On September 2, 2011, he advised plaintiff of a September 12, 2011 bid date.

On September 15, 2011, plaintiff submitted a third offer, this time for $42,000,000. This offer, like the others, acknowledged defendant's interest in a 1031 exchange. Eight days later, Whitmer invited plaintiff and other prospective purchasers to submit their best and final offers. On October 4, 2011, plaintiff submitted an offer to purchase for $44,600,000. This fourth offer again included the same language in the prior three offers that acknowledged defendant's interest in a 1031 exchange.

On October 12, 2011, defendant interviewed plaintiff and other prospective purchasers by telephone. Allen asked each whether they had the equity to close the deal, and he recalled being satisfied with plaintiff's straightforward response that it had sufficient funds to consummate the deal. The next day, Whitmer advised Raman Khosla that defendant received one offer higher than plaintiff's, for over $45,000,000, but defendant was more interested in a buyer with the necessary funds to close and who would not retrade the contract. According to Whitmer, he advised plaintiff that if it would increase its offer to $45,000,000, the deal would be theirs. According to a certification filed by Raman Khosla, plaintiff agreed to increase the purchase price if

defendant would postpone the closing to early January or would accept $1,000,000 post-closing in January.

On October 20, 2011, Whitmer emailed Raman Khosla requesting that they speak the next day and ending his email with: "All good news." The next day, he told Raman Khosla that defendant accepted plaintiff's $45,000,000 bid.

As his deposition testimony reveals, Raman Khosla understood that nothing had occurred up to and including this point that would legally bind either party absent an executed written contract. He also recognized defendant was desirous of closing by December 31, a circumstance which required plaintiff to quickly obtain financing and complete its due diligence.

Allen testified at his deposition that he did not recall defendant's position with respect to a closing date; instead he testified that in his experience defendant's principals did not operate with any urgency. He knew, however, that defendant's principals would not sign a contract without a ready 1031 exchange property and understood that defendant's success in securing a 1031 property would control the pace of any closing. He also understood plaintiff wanted to move quickly on due diligence because plaintiff was "extremely motivated to get this deal done."

After acceptance of its bid, plaintiff sought financing and engaged in due diligence. Meanwhile, the attorneys negotiated and drafted the terms of the contract of sale. Their communications during the contract-negotiation period reveal plaintiff's eagerness to close quickly as well as its increasing frustration with defendant's failure to sign the contract. These communications also reveal that defendant's reticence was produced by complications in its search for a 1031 exchange property.

On October 25, 2011, defendant's counsel emailed a first draft of the contract, which anticipated a closing date in December 2011 with "TIME BEING OF THE ESSENCE as to [p]urchaser as to such date." In the conveying email, plaintiff's counsel stated that the draft had

> not yet been reviewed by our clients and is subject to any comments or changes our clients [m]ay wish to make. There is no contract until such time as a contract has been executed and delivered between the parties.

The draft contract itself, as well as all subsequent drafts, stipulated that the agreement was not binding without a fully-executed and delivered contract, stating:

> The presentation of this document for consideration by the parties shall not constitute an offer, reservation or option for the [p]roperty. Neither the negotiation nor the revision of this document shall constitute a contract or evidence of a contract, and there shall be no binding

10

agreement unless and until this document is executed by and delivered to all of the parties hereto.

Raman Khosla testified at his deposition that he understood that, throughout the course of the contract negotiations, neither party would be bound until the delivery of a signed contract.[8] And, although the draft did not make the transaction contingent on a 1031 exchange, it did anticipate that defendant would close the sale as a tax-free 1031 exchange of property.[9]

---

[8] The draft contract's twelfth paragraph provided that defendant would also not be bound to any representations made by Cushman and Wakefield, declaring that defendant

> shall not be liable for or bound to any verbal or written statements, representations, warranties, real estate brokers' "setups" or information pertaining to the Premises furnished by Seller, any real estate broker, agent, employee, or other representatives of Seller, servant, or any other person, unless the same are specifically set forth herein. All oral or written prior statements, representations, warranties or promises, if any, and all prior negotiations and agreements are superseded by this Agreement and merged herein . . . .

[9] The thirty-fifth paragraph contained plaintiff's acknowledgement that defendant would "have the option of closing the sale contemplated by this Agreement as a 'tax-free exchange' of property under Section 1031 of the IRC" and that the parties "hereto agree to work together in good faith to execute such further documentation as shall be reasonably required to effectuate that result." This was further conditioned on the parties' agreement "that nothing contained in this paragraph" would "cause or require" plaintiff "to take any action posing any financial risk to" plaintiff. This paragraph also permitted defendant to

In forwarding a revised version three days later, defendant's attorney stated that it had not been reviewed by his client and remained subject to his client's review and comment. That same day, plaintiff began the process of applying for a $33,750,000 loan, the bulk of the purchase price. Around this same time, plaintiff's principals executed a loan commitment for $9,000,000 by refinancing property owned by SDK Prospect Towers, a process that began in August or September 2011, before defendant accepted its bid.

On November 16, 2011, plaintiff's counsel sent a revised draft to defendant's counsel; he too expressed that his client had not reviewed it and the draft remained subject to plaintiff's review and comment. As to the provision that defendant could adjourn the closing if warranted by its desire for a 1031 exchange, counsel asserted that he provided in the draft

> that an extension to January 15, 2012 is agreeable, and anything beyond that is subject to my client's lender agreeing to keep the commitment in place on the same terms and conditions.

Plaintiff received its $33,750,000 loan commitment two days later. One of the conditions for the loan was delivery of an executed contract.

---

"adjourn the Closing Date for up to ninety (90) days in order to accomplish the provisions of this Paragraph."

Raman Khosla testified at his deposition that plaintiff never accepted the loan commitment or made any payment toward it because there was never any signed contract, and, without a signed contract, defendant was not obligated to close. He explained that plaintiff did not want to place any more money at risk based upon defendant's promise to sign in the future.

On November 28, 2011, defendant's counsel sent comments on the latest version of the contract that were "subject to further review with our client." The next day, plaintiff had oil tanks on the property tested, and the day after that, plaintiff's principals closed on their $9,000,000 loan.

On December 2, 2011, plaintiff's counsel forwarded a revised contract to his counterpart, advising it had not been reviewed by his client. Plaintiff's counsel also mentioned he had dated the proposed contract December 5, 2011, with plaintiff's intent being to sign on that date.

On December 5, 2011, the parties' respective counsel exchanged emails regarding the most recent draft of the contract, and plaintiff's counsel sent defendant's counsel another draft, still with the disclaimer that it was subject to his client's review and comments, but adding: "I think the Contract is ready to be executed. Please call to confirm your agreement. Our client will be wiring the deposit to the escrow agent." That same day, plaintiff provided its counsel

with a signed signature page of the contract and deposited $1,000,000 into an escrow account. In a certification submitted in response to defendant's summary judgment motion, Raman Khosla claimed that plaintiff so acted at defendant's request.

The next day, December 6, 2011, plaintiff's counsel advised his counterpart that he had "a signature page from [plaintiff] and the deposit [was] delivered to the Escrow Agent." But counsel didn't deliver the executed signature page to defendant and plaintiff understood, as Raman Khosla testified at his deposition, that the deposit would not be released from escrow until plaintiff received a signed contract from defendant.

Two days later, Whitmer exchanged emails with Allen, indicating that plaintiff was "anxious to get a counter signature." Allen responded to Whitmer that "[e]verything is fine," that defendant was "working towards signing the contract [b]ut [defendant had] not finalized [its] 1031 replacement contract." Allen also advised Whitmer that he could "assure [plaintiff] we are working towards the same goal." Whitmer forwarded this email exchange to plaintiff.

On Friday, December 9, 2011, Whitmer told Raman Khosla that defendant would sign the contract that weekend.

14

On Monday, December 12, 2011, plaintiff's counsel emailed a revised draft to defendant's counsel with the comment that "we must sign today." Later the same day, plaintiff's counsel emailed that he had spoken to plaintiff; he advised that:

> As you can imagine [plaintiff] is very frustrated with the situation. [Plaintiff] has directed me to advise you that unless the contract is signed by 3pm on Tuesday December 13th it is breaking off negotiations on this property.

According to Raman Khosla, Whitmer advised on December 13, 2011, that Allen "was going to sign the contract . . .[,] [h]e just need[s] another day or so," and on December 16, 2011, he said that "the contract was with the seller and would get signed this weekend and [plaintiff] would have it by Monday, December 19, 2011." Raman Khosla acknowledged – as he testified at his deposition – that plaintiff's multiple requests about status arose from its understanding that defendant would not be legally bound until it signed the contract.

By a December 19, 2011 email, plaintiff's counsel asked defendant's counsel to "advise when your client has signed the contract today," and to "forward the Seller's signature pages as soon as possible today," reminding defendant's counsel that he had previously advised "that the Seller would not

sign later than today." Plaintiff's counsel also provided a reminder that he had signature pages from his client and the escrow agent, and the $1,000,000 deposit had been in escrow for some time; he said that he was forwarding plaintiff's signature page and the escrow agent's signature page under separate cover.

That same day, Whitmer emailed Allen, asking if he would be available for a meeting with the Khoslas, expressing his belief that the Khoslas "want to meet principal to principal to give them comfort of your sincerity in transacting as soon as possible on your end." Allen responded to Whitmer that he understood the Khoslas' concern but he was unavailable that day. Allen also replied: "Our senior principals will not sign until the 1031 property is secured," and "[w]e anticipate securing an asset the first half of January."

Whitmer forwarded this email exchange to plaintiff. He also sent another email to Allen, asking if he was available to meet the following day, noting that Dinesh Khosla would be leaving the country, and in his absence nothing could be signed. Allen responded that he had meetings the following day in New York, but if plaintiff "will wait until January we will most likely have a deal." Whitmer forwarded this email exchange to plaintiff as well.

Two days later, on December 21, 2011, plaintiff's counsel sent his counterpart another revised contract, which allowed for an adjournment of the

closing date to effectuate defendant's 1031 exchange but anticipated a closing

date no later than March 15, 2012, "provided [plaintiff]'s lender is willing to

extend its commitment, at no additional cost to [plaintiff], on the existing terms

and conditions, including interest rate to such adjourned date." Plaintiff's

counsel also wrote to confirm his understanding that defendant was "not

prepared to sign the Contract at this time" and explained that "this news was

extremely disappointing and distressing" to plaintiff. Plaintiff's counsel also

noted plaintiff's efforts to complete due diligence and obtain financing, and

stated:

> Your client frankly had more than enough time to locate a replacement property. To allow our client to go forward to refinance the properties and incur expenses with regard to due diligence, knowing it did not have a replacement property lined up and wanting to have one prior to signing a contract with our client, is certainly not acting in good faith.
>
> The negotiated form of the contract provides that your client has the ability to extend the closing into March of 2012. We do not understand your client's reluctance to sign the contract. It has the ability to adjourn closing and also has 45 days beyond that date to locate a replacement property. To make your client's lack of a replacement property my client's headache given the history of this transaction, is patently unfair.
>
> My client would be agreeable to discussing a letter of intent, the terms of which would be very simple. A pre-condition of our client would be that we would have

some assurance from the two of you that your client is actively pursuing another property to purchase. In the absence of that, my client would have to re-examine its position.

In a January 3, 2012 email, plaintiff's counsel inquired of his counterpart if there was any news, and by emails dated January 3 and 4, Whitmer communicated with Allen about plaintiff's concerns over maintaining the terms of the $33,500,000 loan, and the interest and costs associated with its refinancing loan, as well as defendant's 1031 concerns. Allen advised Whitmer that defendant was hoping for good news on its 1031 exchange property, and "we are on board for a deal."

According to Raman Khosla, Whitmer advised two days later that the contract would be signed that weekend. In an email sent the next day – Friday, January 6, 2012 – defendant's counsel expressed it would be a good idea to look at the latest version of the contract to see what needed updating. Defendant's letter, which was attached, stated that it was "not in a position to enter into a contract of sale with you at [present] time, however, we anticipate that situation will change in the not to[o] distant future." Defendant also stated that "[w]hile there is no binding agreement between us until a contract of sale . . . is executed and delivered by" defendant to plaintiff, "we do want you to know that we are not marketing the Premises to others at this time." When asked about this at his

deposition, Raman Khosla acknowledged that an agreement was in place but required to be memorialized in the form of a written contract. He also acknowledged no one would be bound without a signed and delivered written contract. Plaintiff's counsel responded to the January 6, 2012 email, agreeing the contract dates would need to be adjusted and advising that, from plaintiff's perspective, the closing date was a function of its lender.

In emails dated January 9, 2012, Whitmer and Raman Khosla addressed the latter's concerns over the delay in execution of the contract. Whitmer expressed to Raman Khosla his understanding that defendant was "ready to sign," but the parties' counsel were still working on finalizing the contract. By separate email that day, plaintiff's counsel stated he had forwarded to his counterpart a revised contract with a closing date of February 8, 2012, and an outside closing date of February 15, although plaintiff would prefer slightly different dates. Counsel further stated that from conversations between his client and the broker, he believed the parties were discussing a signing on January 9 or 10.

On January 11, 2012, plaintiff's counsel emailed a revised contract with a proposed closing date of February 7, 2012, and that an adjournment would be

permitted but no later than March 15, 2012.  By separate letter that same day, plaintiff's counsel enclosed a revised page thirty-two of the contract, and stated:

> [Plaintiff] has asked me to advise you and your client that unless the Contract is signed by the close of business today, it is breaking off negotiations in this matter.

Raman acknowledged at his deposition that he told counsel to advise defendant's counsel of this position.

Finally, by separate emails on that same day, Raman Khosla advised Whitmer that "we have not heard anything"; Whitmer responded, "[i]f not already, you should have a pleasant surprise by 5 pm."  Raman Khosla took this to mean defendant had signed the contract and that plaintiff "would be receiving it."  Whitmer similarly testified that, based on communications he had with Allen, he believed defendant signed the contract on January 11 and was preparing to deliver it to plaintiff through its attorneys.  But Allen misspoke. Although he believed defendant had signed the contract, in fact it had not, and on the evening of January 6, 2012, he advised Whitmer that defendant had requested a twenty-four hour extension due to difficulties experienced with the 1031 property.

In fact, and there is no evidence to the contrary, no contract was ever signed by defendant. Certainly, a signed contract was never delivered to plaintiff.

On January 12 or 13, 2012, Dinesh and Raman Khosla spoke with Bruce McKaba, defendant's president and one of the two individuals authorized to execute the contract for defendant. During their conversation, the Khoslas pressed McKaba for a firm timeline, but McKaba would not commit and stated defendant would execute the contract once the 1031 property was secured. Unsatisfied with this response and unwilling to wait longer, plaintiff considered this the end of negotiations. Thereafter, counsel for the parties exchanged recriminatory letters in anticipation of litigation.

IV

Because plaintiff's claims were dismissed by way of summary judgment, the question for us – when viewing the facts discussed in the prior section in the light most favorable to plaintiff – is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986) (quoted with approval in Brill, 142 N.J. at 536). As our Supreme Court further explained in Brill, the motion judge must consider

"whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540.

In applying this standard, we agree with the motion judges' disposition of defendant's summary judgment motions and that plaintiff's claims for (a) breach of contract, (b) promissory estoppel, and (c) fraud, were correctly rejected.

A

BREACH OF CONTRACT

We agree with Judge Kessler, who dismissed the breach-of-contract claim, that "the undisputed facts demonstrate that the parties did not enter into a binding written or oral agreement" because "[t]he undisputed written communication between the parties" – what he characterized as an "avalanche of correspondence" – demonstrated the parties' understanding "that there would be a written, not an oral agreement[,] and that the written agreement would be executed by and delivered to the parties" before either party would be bound. And it was undisputed that defendant never delivered a signed contract to plaintiff or its representatives. Although plaintiff may assert that Whitmer represented on January 11, 2012, that defendant had executed the contract – and

plaintiff may be entitled to an assumption of the truth of this allegation[10] – plaintiff cannot dispute that, even if signed, the contract certainly was never delivered.  So, any dispute about whether defendant signed the contract cannot stand in the way of a judgment in defendant's favor on the breach-of-contract claim.

The judge's accurate assessment of the factual record dovetails with the his conclusion there was no evidence of an enforceable oral agreement.  The judge correctly recognized that "the course of ongoing communications between the parties[,] which occurred through counsel and the real estate broker[,] demonstrates that [defendant] never intended to be bound by an oral agreement and only intended to be bound when a written contract was executed and delivered . . . ."  This is acutely revealed not only by plaintiff's constant and many inquiries about whether defendant had signed the written contract, but, as well, by plaintiff's multiple threats to break off "negotiations" if defendant did not execute the contract.

---

[10]  We might also assume the truth of plaintiff's assertion that Whitmer was defendant's authorized agent even though the evidence is rather one-sided that Whitmer acted only as a real estate broker with no authority to bind defendant to a contract of sale.  Even if Whitmer were an authorized agent of defendant, his conduct would not establish the existence of a binding agreement because, again, the contract – whether signed or not – was not delivered.

23                                                    A-3149-16T3

Judge Kessler also properly rejected plaintiff's claim of part performance as a basis for the enforcement of an oral agreement. He correctly recognized that plaintiff's conducting of due diligence, its arranging of financing, its signing of the contract, and its depositing of money into escrow, were merely preparatory and with the clear understanding there would be no binding agreement until the contract had been fully executed and delivered; the judge wrote:

> It is apparent that both parties intended to negotiate towards the signing of a contract for sale. This is not the same as intending to be bound by an unsigned contract. The "performance" undertaken by [plaintiff] was that which was required to be in place before a contract would be executed. It was not taken in reliance on the fulfillment of a contract that was not yet signed and delivered. [Plaintiff] has not presented sufficient evidence to present a material issue of fact which can be proved by clear and convincing evidence that it partly performed the contract in reliance on [defendant's] conduct.

The judge's analysis of the factual record is consistent with governing legal principles. For example, it is true that in certain circumstances the Statute of Frauds permits enforcement of an oral agreement for the sale of real property by precluding those instances in which enforcement is not permitted; that is, the Legislature, when amending the Statute of Frauds in 1995, declared that, in the absence of "a writing signed by or on behalf of the party against whom

24

enforcement is sought," N.J.S.A. 25:1-13(a), an oral agreement to transfer an interest in real estate "shall not be enforceable unless":

> a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement and the identity of the transferor and the transferee are proved by clear and convincing evidence.
>
> [N.J.S.A. 25:1-13(b).]

In short, in enacting N.J.S.A. 25:1-13(b), our Legislature opened the door to the enforcement of oral contracts to transfer an interest in real property so long as the necessary elements could be established by clear and convincing evidence.

Before long, we were asked to consider the enforceability of an oral contract for the sale of real property under subsection (b). Prant v. Sterling, 332 N.J. Super. 369 (Ch. Div. 1999), aff'd o.b., 332 N.J. Super. 292 (App. Div. 2000). There, in adopting the reasoning of the chancery judge's published opinion, we were influenced by the 1991 report and recommendations of the New Jersey Law Revision Commission, which stated:

> The circumstances surrounding a transaction, the nature of the transaction, the relationship between the parties, their contemporaneous statements and prior dealings, if any, are all relevant to a determination of whether the parties made an agreement by which they intended to be bound. Thus, if the parties in question have been negotiating the sale of a multi-million dollar office building over many months through the exchange of a

series of redrafted written contracts, it is unlikely that the parties intended to be bound other than in writing. Conversely, if the parties in question have engaged in a series of "handshake" agreements, for the purchase and sale of individual building lots in the past and have honored them in the absence of any writing, their prior conduct could tend to show that they intended to enter into a binding oral agreement.

[Id. at 378.[11]]

This same Law Revision Commission language was cited favorably by the Supreme Court. In Morton v. 4 Orchard Land Trust, 180 N.J. 118, 126 (2004), the Court found no enforceable oral agreement for the sale of real estate in strikingly similar circumstances; because there is no principled distinction to be drawn between the matter at hand and Morton, we quote the Court's holding at some length:

In this case, we cannot find the existence of a contract even in the deferential light in which we must view the facts as presented by plaintiff. From the inception of the dealings between the parties, beginning with the broker-prepared contract, to the final flurry of letters between the attorneys, it is clear to us that plaintiff and defendant intended to be bound only by a written contract. Under the terms of the written contract prepared by plaintiff's realtor, the contract was binding only on "parties who sign it," and the "signed contract" had to be delivered to the parties. (Emphasis added.)

---

[11] The quoted language can be found in the New Jersey Law Revision Commission, Report and Recommendations Relating to the Statute of Frauds 11 (1991), available at http://www.lawrev.state.nj.us/rpts/fraud.pdf.

The realtor and plaintiff signed the contract, but defendant did not. The realtor contemplated that defendant would forward to her a signed copy to consummate the deal.

. . . .

. . . In this case, a binding, oral agreement is not suggested by the circumstances surrounding the negotiations, or by the relationship of the parties, or by the parties' contemporaneous statements and past dealings. This case is similar to Prant, in which the initial offer was in writing as were all meaningful communications between the parties, leading to one inescapable conclusion – the parties did not intend to be bound by an oral agreement. See Prant, 332 N.J. Super. at 371-74. The sale of the Orchard Court property was not expected to end on the basis of a handshake or a verbal utterance by the Trustees to the realtor.

[Id. at 128, 130.[12]]

Like Morton, the parties here are sophisticated business people. They had no prior relationship, and they engaged in an arms-length transaction for a large apartment complex priced by them at $45,000,000. Plaintiff's written offers for the purchase of the property all set forth that the parties would not be bound

---

[12] The Court also distinguished McBarron v. Kipling Woods, LLC, 365 N.J. Super. 114, 118 (App. Div. 2004), where, as the Morton Court observed, "the negotiations were entirely oral, with the deal consummated over the telephone followed by repeated verbal confirmations by the seller that the deal was done and would be honored." Morton, 180 N.J. at 130.

absent a written contract. And, once plaintiff's final offer was accepted, the parties negotiated a written contract between counsel, over a period of several months. All versions of their draft contract contained a clause stating that the parties would not be bound absent an executed agreement that had been delivered to the parties. See Morton, 180 N.J. at 128-29; Prant, 332 N.J. Super. at 379-80.

All other communications also revealed the parties' understanding that they would not be bound absent an executed written and delivered contract. Indeed, Raman Khosla testified to plaintiff's understanding that the parties would be bound only by a written agreement, and there is no other reasonable explanation for plaintiff's repeated demands that defendant sign the contract, or its repeated threat that if defendant did not sign the contract plaintiff would break off negotiations.

Plaintiff's argument that it partially performed does not alter our conclusion. The facts, when viewed in the light most favorable to plaintiff, demonstrate that its actions were merely preparatory, to ensure its ability to close on the deal once the contract was executed and delivered. See Kopp, Inc. v. United Techs., Inc., 223 N.J. Super. 548, 556-57 (App. Div. 1988); Kufta v. Hughson, 46 N.J. Super. 222, 229 (Ch. Div. 1957). Moreover, the evidentiary

record, including plaintiff's written offers to purchase the property, and its communications threatening to end negotiations and noting the costs it incurred, clearly shows plaintiff's understanding that it incurred these expenses at its own risk.

B

PROMISSORY ESTOPPEL

Defendant was once denied summary judgment on plaintiff's promissory estoppel claim.[13] But a later summary judgment motion, filed after further discovery, including Raman Khosla's deposition, was granted.

In his February 17, 2017 opinion, Judge Vena determined there was no sufficient evidence from which a rational factfinder could conclude that defendant made a clear and definite promise that would reasonably induce plaintiff to act or forbear. The judge cited Raman Khosla's deposition testimony that plaintiff "was aware, from the outset of the contract negotiations in July 2011 to the termination of said negotiations in January 2012, that [d]efendant's offer to sell . . . was contingent on there being a signed, written, and delivered contract." Because the parties understood "neither . . . would be legally bound

---

[13] The judge also denied a reconsideration motion and we denied a motion for leave to appeal that addressed this issue.

to the other . . . until there was a signed, written contract which was acceptable to both parties" and both could "'walk away' from the deal at any time" until a fully-executed contract was delivered, the judge concluded there was no promise – clear and definite or not – that could form the basis for a viable promissory-estoppel claim.

The judge properly recognized that there was no genuine dispute on the question whether defendant could reasonably have expected to induce reliance on plaintiff's part because both sides acted on the understanding that no one would be bound or rely absent a fully-executed and delivered contract. And he also correctly concluded that the plaintiff could not have reasonably relied on any of defendant's representations for the same reason.[14]

Judge Vena's conclusions were in accord with applicable legal principles. "Promissory estoppel is made up of four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." Toll Bros., Inc. v. Bd. of Chosen Freeholders of Cty. of Burlington, 194 N.J. 223, 253 (2008).

---

[14]   The judge sagaciously recognized that plaintiff's allegations were also inconsistent about the reasonable-reliance element. For instance, plaintiff did not pay the $1,000,000 deposit to defendant but instead placed it in escrow "because . . . there was a chance that negotiations would terminate and that if it paid the money to [d]efendant, it would be non-refundable."

A-3149-16T3

In contending that it met all these elements, plaintiff relies heavily on our decision in Pop's Cones, Inc. v. Resorts International Hotel, Inc., 307 N.J. Super. 461 (App. Div. 1998).

In Pop's Cones, the plaintiff negotiated with the defendant about the possible relocation of the plaintiff's frozen yogurt business on the Atlantic City boardwalk to space owned by the defendant, with the defendant offering inducements to encourage the plaintiff's interest in a particular site. After the plaintiff made a written offer, it advised the defendant of its need for a timely decision, given the timing of its lease renewal if it did not change location. Id. at 464-65. In response, the defendant assured the plaintiff that it would have little difficulty in concluding the agreement, and the defendant explicitly advised the plaintiff to give notice it would not be extending its present lease, to pack up its store, and to plan on moving. Id. at 465. In reliance on these assurances, the plaintiff gave notice on its lease, moved its equipment into temporary storage, sent designs for its new store to its franchisor, and retained an attorney to represent it in finalizing a lease with the defendant. Ibid. The parties' counsel then negotiated a proposed lease. Id. at 465-66. Ultimately, the defendant withdrew its offer to lease space to the plaintiff, and the plaintiff filed

suit. Id. at 466-67. The trial court granted summary judgment in the defendant's favor. Id. at 468.

In reversing, we relaxed the requirement of a clear and definite promise in Restatement (Second) of Contracts § 90 (1979), and held that promissory estoppel requires only "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee." Id. at 463, 471-72. Applying this less rigid standard, we concluded the facts supported a valid promissory estoppel claim. Id. at 472-73.

This case is markedly and materially different from Pop's Cones. Defendant made no promise to convey the property absent additional conditions – again, at the risk of becoming tiresome – that there be a written, executed and delivered contract – so reliance on what preceded that event, which never occurred, could not be found by a rational factfinder to be reasonable. See Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 264-65 (2d Cir. 1984) (holding that a promissory estoppel claim could not be established where defendant made no clear promise to consummate a deal because the parties' negotiations "as reflected in the draft agreements made it clear that the obligations" of both parties "were contingent upon execution and delivery of the formal contract documents").

A-3149-16T3

C

FRAUD

In granting summary judgment dismissing plaintiff's fraud claim, Judge Vena recognized that – even when given a favorable view of the evidence – plaintiff had offered only "bare assertion[s]" and he concluded there was no "evidence beyond mere suspicion to permit a rational jury to find in favor of [plaintiff] at trial on the issue of whether [defendant] made knowing and intentional misrepresentations regarding [its] intentions with respect to a 1031 exchange[.]"

The judge also denied plaintiff's motion for reconsideration on this point. He found Allen's deposition testimony was not new evidence, because the record was already replete with evidence that plaintiff knew as early as its July 2011 offer that defendant intended to pursue a 1031 exchange, and in December 2011 defendant made it clear that it would not sign the contract in the absence of a 1031 exchange property. The judge soundly observed that defendant:

> merely acted in accordance with the option it included in the drafts. Options by their very nature provide flexibility for parties who hold them. Defendant exercised its option – which [p]laintiff knew [d]efendant had – not to proceed without a 1031 replacement property. This is not fraudulent. If anything, the drafts put [p]laintiff on notice that such a decision [by] [d]efendant was entirely within the realm

33

of possibility. That the existence of a 1031 replacement property factored into [d]efendant's decision to approve or [dis]approve or to finalize or not finalize the contract does not necessarily equate to the contract's ultimate completion being expressly contingent on the existence of a 1031 replacement property.

And the judge recognized that the reason for defendant's refusal to sign the contract was largely irrelevant given the parties' understanding – we say once again – that the anticipated transaction was not binding absent a written, fully-executed and delivered contract.

Fraud requires clear and convincing evidence, Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 395 (App. Div. 1989); Albright v. Burns, 206 N.J. Super. 625, 636 (App. Div. 1986), of "a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment," Jewish Ctr. of Sussex Cty. v. Whale, 86 N.J. 619, 624 (1981). Accord Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997); Suarez v. E. Int'l Coll., 428 N.J. Super. 10, 28 (App. Div. 2012). To be actionable, "the alleged fraudulent representation must relate to some past or presently existing fact and cannot ordinarily be predicated upon matters in future." Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 380 (App. Div. 1960). "An exception to this rule exists in the case of a false representation of an existing

intention, i.e., a 'false state of mind.'" Ibid. So, "[i]ncluded within the first element [of a fraud claim,] are promises made without the intent to perform since they are 'material misrepresentations of the promisor's state of mind at the time of the promise.'" Bell Atl. Network Servs., Inc. v. P.M. Video Corp., 322 N.J. Super. 74, 95-96 (App. Div. 1999) (quoting Dover Shopping Ctr., Inc. v. Cushman's Sons, Inc., 63 N.J. Super. 384, 391 (App. Div. 1960)).

Plaintiff argues in its appeal brief that there was a material issue of fact as to whether defendant "misrepresented . . . its intention to close on the sale without having a 1031 exchange." The record, however, contains no evidence of this alleged misrepresentation.

Defendant did not affirmatively misrepresent, nor did it conceal, its intention to pursue a 1031 exchange with respect to sale of the property. As we have already established, defendant informed its broker of this fact, and plaintiff was aware of this fact when it submitted its first offer in July 2011. The parties also addressed this issue in the draft contracts exchanged. There is no evidence that defendant ever promised to execute the contract before it secured a 1031 exchange property.

There is also a dearth of evidence that defendant intended for plaintiff to rely on the deal proceeding in the absence of a 1031 exchange. To reiterate –

35

for the last time – both sides knew neither was bound absent a written, executed, and delivered contract.

The fraud claim was properly dismissed.

V

Lastly, we consider plaintiff's argument that its motion for leave to amend the complaint to assert a claim of negligent misrepresentation was erroneously denied. Filed at the eleventh hour, the motion was denied because the judge found the application untimely and the proposed amendment without merit. We find no abuse of discretion.

In exercising discretion in deciding a motion for leave to amend a complaint, a judge must consider the prejudice resulting from the late amendment and whether permitting the amendment would constitute a "futile" act because the new claim would not be sustainable. Notte v. Merch. Mut. Ins. Co., 185 N.J. 490, 501 (2006).

Considering the case's age – it was commenced in March 2012, and the motion to amend was filed nearly five years later in February 2017, when defendant's last summary judgment motion was pending and with a scheduled trial date a month away – the prejudice was obvious. See Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 134-35 (1999). The futility element was also fully

implicated. If permitted, the new claim would ultimately fall once defendant moved for summary judgment, because the same factual circumstances that barred the fraud claim would bar the negligent-misrepresentation claim, which requires proof that defendant negligently made an incorrect statement that plaintiff justifiably relied upon, causing damage. H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 334 (1983); Masone v. Levine, 382 N.J. Super. 181, 187 (App. Div. 2005).

* * *

To the extent we have not discussed any other issue presented by plaintiff, it is because we find any such argument lacks sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION