**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4520-18T2

PETER FONTANA and KATHY
FONTANA,

     Plaintiffs-Respondents,

v.

EXECUTIVE CARS, NEW YORK
BLACK CAR.COM, ROYAL
DISPATCH SERVICES, INC.,
KING LEE CHEUNG and TWIN
LIGHTS INSURANCE COMPANY,
INC.,

     Defendants,

and

GLOBAL LIBERTY INSURANCE
COMPANY OF NEW YORK,

     Defendant-Appellant.

_____

Argued telephonically April 20, 2020 –
Decided July 15, 2020

Before Judges Ostrer, Vernoia and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-1359-11.

Vincent F. Gerbino argued the cause for appellant (Bruno Gerbino & Soriano, LLP, attorneys; Matthew J. Smith, on the briefs).

Robert A. Jones argued the cause for respondents.

PER CURIAM

In our initial decision in this matter, we concluded defendant King Lee Cheung is not an insured under a commercial liability insurance policy issued by defendant Global Liberty Insurance Company of New York (Global) to defendant Royal Dispatch Services, Inc. (Royal).[1] Fontana v. Executive Cars, No. A-3151-15 (App. Div. Nov. 8, 2017) (slip op. at 23). We found, however, there is coverage under the policy for Cheung's negligence "if it is determined that Royal, as the insured, is vicariously liable for Cheung's putative negligence that resulted in plaintiffs' [Peter Fontana and Kathy Fontana] alleged injuries." Id. at 22. We reversed orders finding Cheung was an insured under the policy and remanded for the court to determine if Royal is vicariously liable for Cheung's alleged negligence. Id. at 23-24.

---

[1] Royal is also referred to as Executive Cars and New York Black Car.com. We refer to the entities collectively as Royal.

A-4520-18T2

Global appeals from a May 20, 2019 order, entered after the bench trial following our remand, in which the court found: Royal is vicariously liable for defendant Cheung's negligence in causing plaintiff's alleged injuries;  Royal is responsible to pay the sums due to plaintiffs in accordance with a February 10, 2016 consent judgment; and the consent judgment remains in full force and effect, and plaintiffs are entitled to enforce its terms.  Having considered the record and the arguments presented by the parties in light of the applicable law, we affirm.

I.

Royal operates a transportation services business that its president describes as a "black car service" and "corporate transportation by Town Cars car service."  It enters into franchise agreements with drivers of passenger vehicles and dispatches the drivers to provide transportation services to its customers.  Cheung was a party to a franchise agreement with Royal, and Royal dispatched Cheung to pick up and transport Royal's customers.

On February 24, 2010, Royal dispatched Cheung to transport plaintiff Peter Fontana (Fontana), an employee of one of Royal's corporate clients, American International Group, Inc. (AIG), from New York City to Fontana's

New Jersey home.  Cheung picked up Fontana and, during the trip, was involved in a single vehicle accident in which Fontana was injured.

Fontana and his wife, plaintiff Kathy Fontana, filed a personal injury action against Cheung, individually and in his capacity "as the agent, servant, [or] employee of" Royal.  The complaint was later amended to include a claim for a declaratory judgment that a commercial liability policy issued by Global to Royal provided coverage for Cheung's negligence.

Following a bench trial on the declaratory judgment claim, the court entered orders finding Cheung was entitled to liability coverage and indemnification under the Global policy.  The orders were based on the court's determination Cheung was an insured under the policy because Royal and Global reasonably expected such coverage was provided under the policy's terms.

Following entry of the court's orders on the coverage issue, plaintiffs, Global, and Cheung reached a settlement that was incorporated in the February 10, 2016 consent judgment.  In pertinent part, the consent judgment states the parties "agreed to adjudged damages on consent in the total amount of $750,000 for [p]laintiffs['] personal injury claim against . . . Cheung, arising out of the February 24, 2010 automobile loss."  The consent judgment further provided

A-4520-18T2

that $100,000 of the judgment would be paid by Cheung's personal automobile insurance carrier, and that $650,000 would be paid by Global. The consent judgment also provided, however, that Global intended to appeal from the court's orders finding it was required to provide coverage to Cheung, and the judgment stated that if Global prevailed on its appeal from those orders, plaintiffs would not receive any monies from Global under the settlement and plaintiffs would not attempt to enforce the judgment against Cheung's personal assets.

Global appealed from the court's orders finding Cheung had coverage under its policy. The issue presented on appeal was whether the court correctly determined Cheung was entitled to coverage based on its finding he was an insured under the policy. As noted, we determined the court erred in finding Cheung was an insured under the policy, but we remanded for the court to determine if there is coverage under the policy because Royal, which is the named insured under the policy, is vicariously liable for Cheung's negligence. See Fontana, slip op. at 23-24. The consent order was included in the record on appeal, but none of the parties made any arguments based upon it. Instead, all of the arguments presented focused on whether there was coverage under the policy for Cheung's negligence.

5

The Remand Court Addresses Global's Claims Under The Consent Judgment

Before the remand court, Global argued that it prevailed on appeal and, as a result, it had no obligation under the consent judgment to pay the otherwise agreed upon $650,000 to plaintiffs.[2]  Global further contended that because it prevailed on appeal, the settlement reflected in the consent judgment rendered it unnecessary to determine the issue for which the remand was ordered; whether Royal was vicariously liable for Cheung's negligence.

In a written opinion dated March 23, 2018, the court rejected Global's contention that it "prevailed on the appeal and this action is concluded by the terms of the consent judgment."  The court found Global's position was "inconsistent with the plain language of both the consent judgment and [our] remand" order.  The court further found Royal was vicariously liable for Cheung's negligence.

---

[2] Based on colloquy during subsequent proceedings, it appears the court's March 23, 2018 letter opinion was issued as the result of issues raised during a case management conference following our remand.  The record includes neither a transcript of the case management conference nor any motion papers supporting Global's apparent request that the court determine the consent order barred further proceedings on remand.

A-4520-18T2

The record on appeal does not include an order entered as a result of the court's March 23, 2018 opinion. We discern, however, that subsequent to issuance of its opinion, the court entered an order dismissing plaintiffs' complaint. That is because on October 15, 2018, a different judge entered an order reinstating plaintiffs' complaint, noting it had been "dismissed without prejudice."[3]

The October 15, 2018 order included two findings. First, it adopted as "valid" the findings in the court's March 23, 2018 opinion rejecting Global's claim that it prevailed on the initial appeal under the terms of the consent order, and that, because it prevailed, further litigation over whether the policy provided coverage for Cheung's negligence based on Royal's vicarious liability for his actions was barred under the consent judgment. Second, the October 15, 2018 order vacated the court's finding in the March 23, 2018 opinion that Royal was vicariously liable for Cheung's negligence; instead, the order scheduled a bench trial on the issues of negligence and vicarious liability.[4]

---

[3] By the time the October 15, 2018 order was entered, the judge who issued the March 23, 2018 opinion had retired.

[4] The order noted the parties consented to a bench trial.

The Remand Trial

At the bench trial, plaintiffs presented Cheung and former Royal employee Amnon Oberlander as witnesses, and plaintiffs' counsel also read from deposition and prior trial testimony of Fontana and Royal's president, Turdik Ozen. Global did not present any witnesses. Royal's counsel read a portion of Ozen's prior testimony into the record. The parties also introduced various documents into evidence.

The evidence showed that in 2010, Royal, doing business as Executive Cars Service, was party to a "Service Agreement" with AIG pursuant to which Royal agreed to provide "car service" to AIG. In pertinent part, the agreement required that Royal's "drivers . . . carry automobile liability insurance," and that Royal maintain a "general liability policy with coverage of $2,000,000." Royal represented that it would "not subcontract [its services] to any other black car company without the express written consent of AIG," but Royal reserved the right to subcontract work "to its own affiliates." Royal also represented that its "drivers will ensure that AIG riders initial all necessary information for billing purposes," and that in the event one of Royal's drivers falsified a billing voucher to AIG, it would "at a minimum" remove the driver from servicing the AIG

account, and, "[d]epending upon the circumstances, [the driver] may be dismissed from" Royal.

On February 24, 2010, Fontana was employed by AIG in its New York offices. AIG had a policy that if Fontana worked beyond 9:00 p.m., AIG would pay for a car service to take Fontana home. Fontana understood AIG "had an exclusive contract with [Royal] to provide cars and drivers to [AIG's] employees to be driven home," and AIG provided him Royal's phone number and instructed he could call only that number to arrange for car service. Prior to February 24, 2010, Fontana called Royal to obtain car service from his office in New York to his home in New Jersey. On that date, he called Royal for a ride home, and the person answered the phone by stating, "Executive Cars." The person who answered the phone made the arrangements for the car service and gave Fontana the number of the car that would provide the requested service.

Fontana understood all the drivers who drove him home as the result of his calls to Royal were employees of the company. He was never advised otherwise by any of the drivers. On February 24, 2010, Royal sent Cheung to pick up Fontana in New York and drive Fontana to his New Jersey home.

When Cheung arrived to pick up Fontana, Cheung told Fontana he was from Executive Cars. Cheung's car exhibited a sign stating "Executive Cars"

and the number Royal assigned to his vehicle. The number matched the one provided to Fontana when he arranged for the service with Royal. On the rear of Cheung's car, he had a second sign with "Executive Cars" and his assigned number printed on it. Royal provided the signs to Cheung and required that he display them.

When Fontana was in Cheung's vehicle, he completed a voucher for the service that, in part, indicated he was using a car service provided by Executive Cars. On the ride that followed, Cheung lost control of the car and was involved in a single-vehicle collision that caused personal injuries to Fontana.

Cheung testified he began his association with Royal in 2001 when he responded to an ad in a Chinese-language newspaper. He was directed to Royal's offices where he was presented with an eighty to a one-hundred-page agreement that he signed without reading. The agreement is entitled "Franchise Agreement," and it was admitted in evidence. Cheung testified he was never given a copy of the agreement he signed.

Cheung explained Royal subsequently trained him how to greet Royal's customers and how to use a computer he was required to buy from Royal to obtain the car service assignments. In part, Royal trained Cheung to tell customers, "something like, I'm from Executive Cars."

A-4520-18T2

Royal directed the location and time a customer was picked up. If a customer asked, Cheung said he was from "Executive Cars." If during a service his car broke down, Royal sent another driver in another car to pick up the passenger.

Cheung also explained that in 2010, he worked twenty to thirty hours per week for Royal, and that Royal did not permit him to provide services for any other company. Cheung was permitted to select the days and times he chose to work, but Royal required Cheung work one 4:00 a.m. to 9:00 a.m. shift each week. If Cheung did not work the shift, he was penalized by Royal.

Cheung owned his vehicle and paid all the expenses related to its operation, including maintenance, licensing, insurance, and fuel costs. Cheung testified Royal had numerous rules with which he was required to comply. For example, Royal required he keep his car washed, be on time for all pick-ups, and be polite to Royal's customers. Royal also determined how long Cheung could use a car to provide service to Royal's customers, and Royal could stop making assignments if Cheung did not get a new car when Royal required him to do so. Cheung further explained Royal inspected his car and required he wear a specified uniform.

A-4520-18T2

Cheung received car service assignments from Royal. Cheung was required to have the customers complete vouchers provided by Royal for the service provided, and Cheung delivered the vouchers to Royal. The rates charged for the services were not determined by Cheung but instead were established between Royal and its customers. Cheung was barred from charging a different rate unless the route changed after Royal made the service assignment. Royal collected payments from its customers for the services provided by Cheung; deducted agreed upon fees, payments, and other costs; and paid Cheung the balance. Royal did not withhold any federal or state tax or other deductions from the sums paid to Cheung, and it issued Cheung a 1099 form each year.

Amnon Oberlander testified he was employed by Royal from 1999 to 2017 as its franchisee liaison. He explained Cheung was a Royal franchisee who was party to the Franchise Agreement. He testified the franchisees drove for "themselves," but he acknowledged they did not find customers on their own and drove customers assigned by Royal.

He also acknowledged the Franchise Agreement states there is a franchisee rule book the franchisees are bound to follow, but he denied Royal maintained a rule book. He explained there is a committee or board of Royal's

franchisees that promulgates the rules for Royal's franchisees and that the board enforced the rules against Royal's franchisees. He acknowledged the rule book begins in bold letters with the phrase, WELCOME TO ROYAL DISPATCH SERVICES, INC. (D/B/A EXECUTIVE CARS), but he asserted Royal has no control over the rules. He testified, however, that the Franchise Agreement nonetheless requires that each franchisee comply with the rule book's requirements.

Oberlander also explained some of the rules in the rule book the franchisees are bound by the Franchise Agreement to follow. Franchisees must: follow all instructions given by Royal's dispatchers and if the instructions are incomplete must get additional instructions from the dispatcher; follow the route in the navigation system for all pick-ups; and obtain directions from Royal's dispatcher for pick-ups.

In addition to the requirements of the rules addressed by Oberlander in his testimony, the rule book to which Cheung was bound under the Franchise Agreement also requires in part that he: "[a]void arguments or fights with other drivers"; "get out of [his] car . . . if [the passenger has] any boxes or luggage;" remain parked outside of "the drop-off point [at night] until [the] passenger is safely in the house, office or building," and, where a passenger is dropped off at

a parking lot at night, "wait . . . in [the] parking lot until he [or she] is in his [or her] car and gets it started." The rules impose further requirements including, but not limited to, the following; a franchisee's car must have a "telephone, reading light, AM/FM radio and cassette, all window and door locks, air-conditioning and heating, shocks and springs, front lights, tail lights, signals and flashers" as well as "a pen and a small clipboard for the passenger to use when signing [Royal's] vouchers."

Moreover, the rules state that an "Executive Cars" magnetic sign "must always be in [the] vehicle" and must be "placed on the back panel of the vehicle's trunk and must be visible" when the franchisee is available for assignments "or on any job assignment." The company's "license plate frames" must "indicat[e] the compan[y] name[], the [t]elephone number and [the company's] web address," and they "must be placed on the [vehicle's] front and . . . rear" license plates.

The rules further provide that if a franchisee "bail[s] out" of a car service assignment due to traffic conditions, the dispatcher will attempt to get another franchisee to "cover the call, but if [the dispatcher] is unable to find another unit within a reasonable [estimated time of arrival], the original [franchisee] will still be responsible for the job." If the franchisee does not satisfy his or her

responsibility for the job, he or she is sanctioned by not receiving any assignments for three hours. In addition, the rules also provide that franchisees will be directed on their computers to "check in" at designated locations when providing car service at airports.

The rules contain many other requirements governing the manner in which franchisees are required to provide their services to Royal's customers. Oberlander explained the Franchise Agreement requires a franchisee's compliance with all the rules in the rule book, including those detailing the manner in which the franchisee's cars were to be maintained and those requiring the franchisees submit to random drug and alcohol testing. He emphasized the rule book was created by the franchisee committee, but he agreed that any violation of the rules constituted a breach of the Franchise Agreement.

Oberlander explained that when a Royal customer called to book a car service, the dispatcher provided the customer with the number of the car assigned by Royal. He testified the cars displayed the numbers and "Executive Cars" signage so the customer could identify the car when it arrived for a pick-up. Oberlander testified that placing the assigned number and company signage on the vehicles was for the purpose of: achieving the result of getting the customer from the pick-up to the drop-off points; permitting customers like

Fontana to identify the car they hired from Royal; protecting Royal's reputation; and contributing to Royal getting additional business from their customers. According to Oberlander, Royal did not advise the customers that the drivers of the vehicles were independent contractors, but Royal was in the business of providing rides to its customers and it could not do it without the drivers.

The Court's Decision

Following the presentation of the evidence, the court heard summations and issued a lengthy and detailed opinion from the bench. The court noted at the outset that the prior judge's March 23, 2018 letter opinion, as adopted in the October 15, 2018 order, determined Global was obligated to pay Cheung under the consent judgment if it was determined Royal is entitled to coverage for Cheung's negligence based on vicarious liability. The court also noted that as a result of the entry of the consent judgment, the case was dismissed as to Royal without prejudice, but had been revived against Royal following our remand. Royal therefore participated in the remand trial.

The court found Royal's business involved obtaining contracts from businesses pursuant to which Royal provided "rides" to the businesses' employees, and that the franchisees provided the transportation under the contracts. The court noted the parties recognized that whether Royal was

vicariously liable for Cheung's negligence was dependent on whether there was a master-servant relationship between Royal and Cheung. The court found that determination required application of the control test explained by our Supreme Court in Wright v. State, 169 N.J. 422 (2001), and a consideration of the factors for determining the existence of a master-servant relationship under Restatement of Agency § 220 (1958).

The court observed that Global and Royal claimed the Franchise Agreement established Royal did not exercise sufficient control over Cheung to support a finding it had a master-servant relationship with Cheung. The court, however, found that although the Franchise Agreement attempts to portray Cheung as an independent contractor, Royal actually exercised control over almost all aspects, manners, and means of the service Cheung provided his passengers.

The court noted that Cheung owned his own vehicle and was responsible for paying all the costs associated with its operation and maintenance, and that he was generally able to determine the days and times he worked. The court found Royal exercised control over Cheung's provision of services to his passengers in his vehicle by: designating the kind of car with which Cheung was required to transport his passengers; requiring the cars be only of a certain

17

age; performing inspections on Cheung's vehicle; defining the insurance Cheung was required to maintain and the place from which he purchased it; training Cheung as to the manner in which he was required to interact with his passengers; imposing punishment if Cheung refused an assignment from Royal; requiring Cheung work a 4:00 a.m. to 9:00 am shift each week and penalizing him if he refused the assignment; requiring Cheung follow the route on the GPS to transport his passengers; requiring Cheung communicate with Royal if the passenger wanted Cheung to take a route different than the one on the GPS; retaining the right to require that Cheung replace his vehicle; and requiring that Cheung follow instructions from Royal's dispatcher.

The court further found Royal controlled the manner in which Cheung provided services to his passengers through its adoption of the rule book, which imposed innumerable standards and requirements on Cheung that he was required to follow in providing service to his passengers. The court noted Cheung was not free to "make his own rules" as to how he provided his services to his passengers; instead, Cheung was contractually bound to Royal to follow each and every rule in the rule book.

The court found Cheung's testimony to be credible, and it viewed Oberlander's testimony with "great suspicion" due to the manner in which he

18

responded to the questions and his apparent agenda to convince the court Cheung did not have a master-servant relationship with Royal. The court accepted Cheung's testimony that Royal prohibited him from using his vehicle "to work or pick up passengers on his own" or charge "any rate different from the rate that had been contracted" between the passenger and Royal. The court noted that Cheung did not set the rate for the services he provided to his passengers; all the rates were established for him by Royal.

The court further found that under Royal's contract with AIG, Royal was obligated to provide a vehicle and driver to transport the passenger, and that Royal did so for Fontana by sending Cheung "to drive the vehicle on behalf of Royal or Executive" Cars. Moreover, the court found Royal required that Cheung identify himself as being from Executive Cars; "represent that he was driving on behalf of Executive Cars"; and exhibit "a sign in his car that said he was Executive Cars."

The court concluded Royal "had complete control, not only [of how to] drive here to there; but, how to drive from []here to there, what to wear, what kind of car that [the franchisee] needed to have, how [the franchisee] needed to dress, even down to the details of what [the franchisee] could say . . ." to the

passengers. The court also found it did not "know how much more control . . . there could be."

Beyond the issue of control, the court found Cheung performed a service identical to that which Royal's business supplied. As its president explained, Royal was in the black car service business, and Cheung drove a black car and provided that service. Cheung did not have any other profession, and "he only could do it in the manner in which [Royal] described it and the businesses, themselves, are so merged and [enmeshed], that they could[] [not] be . . . separate."

The court found that Cheung's services did not require any particularly special skill, and that Cheung provided all of the instrumentalities required to provide the service. The court noted, however, that Royal required Cheung use only certain approved vehicles, and that Royal required Cheung use a proprietary computer he purchased from Royal to accept his assignments and perform his duties.

The court further determined the length of time anticipated for the performance of Cheung's services supports a finding of a master-servant relationship because the performance of all his services was intertwined with Royal and under Royal's control. The court, however, found the method of

payment to Cheung "was set up for the purposes of being independent" and supported Global's claim Cheung was an independent contractor.

The court also determined Royal's contract with AIG, pursuant to which Royal assigned Cheung to transport Fontana, supports a finding Cheung was Royal's servant. The court noted the agreement indicated Royal would provide its "drivers" to provide the car service, and it never mentioned franchisees or independent contractors.

In sum, after weighing all the factors, the court determined that under the control test, Cheung was in a master-servant relationship with Royal when he transported Fontana on February 24, 2010. The court concluded Royal was therefore vicariously liable for Cheung's negligence when the single car collision that caused Fontana's injuries occurred.

The court also determined Royal was vicariously liable for Cheung's negligence under the doctrine of apparent authority. The court found Fontana called the number for Executive Cars; was told he called Executive Cars; and booked the car service with Executive Cars. He was told to look for a car bearing an "Executive Cars" sign with a particular number, and Royal sent Cheung in a car with that sign and number to provide the requested service. The court found

21

Fontana would not have entered Cheung's car without a reasonable belief that he was being driven by an Executive Cars employee or agent.

The court found Royal took every action possible to communicate to its customers that the cars and drivers it dispatched were its employees or agents, including the manner in which the requests for service were received and booked, the signage on the cars, the voucher for payment required and provided, and the requirement that the drivers, such as Cheung, identify themselves as being from Executive Cars. Thus, the court determined there was sufficient evidence supporting a reasonable inference that Fontana entered the vehicle reasonably relying on Cheung's status as Royal's agent and employee.

The court entered an order finding Royal vicariously liable for Cheung's negligence, and further finding Global's policy provided coverage for Cheung's negligence. The order also provided that the consent judgment remains in full force and effect and, subject to a stay pending the exhaustion of any appellate remedies sought by Global, plaintiffs could take appropriate action to enforce the consent judgment. This appeal followed.

## II.

Our standard of review from the trial court's findings following a bench trial is limited. We defer to "those findings of the [court] which are substantially

influenced by [its] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Locurto, 157 N.J. 463, 471 (1999) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We will "not disturb the factual findings and legal conclusions of the trial [court] unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice[.]" Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting In re Trust Created by Agreement Dated December 20, 1961, ex. rel. Johnson, 194 N.J. 276, 284 (2008)). We owe no deference to the court's interpretation of the law or its application of the law to the facts. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Royal argues the court erred in finding it is vicariously liable for Cheung's negligence under the doctrine of respondeat superior. More particularly, Royal argues the court misapplied the control test for determining liability under the doctrine of respondeat superior to the facts established by the trial evidence. Royal also contends the court erred by finding Royal vicariously liable under the doctrine of apparent authority because there was no evidence Fontana justifiably relied on any representation by Royal that Cheung was its agent.

Royal last contends the appeal should be dismissed because it prevailed in the initial appeal under the terms of the consent judgment. We consider Royal's arguments in turn.

A.

We summarize the legal principles defining vicarious liability based on the doctrine of respondeat superior. "Ordinarily, an employer that hires an independent contractor is not liable for the negligent acts of the contractor in the performance of the contract." Bahrle v. Exxon Corp., 145 N.J. 144, 156 (1996). However, "[t]here is perhaps no doctrine more firmly imbedded in the law than the principle that liability follows tortious wrongdoing and that employers or principals, individual or corporate, are responsible for that wrongdoing when committed by agents and employees acting within the scope of the employment." McAndrew v. Mularchuk, 33 N.J. 172, 190 (1960). "The responsibility of the master or principal for the negligent acts of a servant or agent, committed while performing his [or her] delegated tasks," "creates an incentive to be careful in the selection, instruction[,] and supervision of such persons[,]" and "the master is better able to bear the burden of the losses resulting from such tortious acts by absorbing them as an incident of the operation of his enterprise." Id. at 191-92.

To establish liability under the doctrine of respondeat superior, a plaintiff must prove: "(1) that a master-servant relationship existed and (2) that the tortious act of the servant occurred within the scope of that employment." Carter v. Reynolds, 175 N.J. 402, 409 (2003). The first prong of the standard is centered on the relationship of the parties.[5] Ibid. If no master-servant relationship exists, no further inquiry is necessary. Ibid.

"[C]ontrol by the master over the servant is the essence of the master-servant relationship on which the doctrine of respondeat superior is based." Wright, 169 N.J. at 436 (quoting N.J. Prop. Liab. Ins. Guar. Ass'n, 195 N.J. Super. 4, 8 (App. Div. 1984)); see also Majestic Realty Assocs., Inc. v. Toti Contracting Co., 30 N.J. 425, 430-31 (1959) (explaining one exception to the "doctrine that ordinarily . . . a person engages a contractor, who conducts an

---

[5] To find vicarious liability under the doctrine of respondeat superior where a master-servant relationship is established, a plaintiff must also prove the alleged tortious conduct took place within the scope of that relationship. See ibid. Royal challenges the court's finding a master-servant relationship existed between Cheung and Royal. It does not argue that, if such a relationship existed, plaintiff failed to prove Cheung's tortious conduct occurred with the scope of that relationship. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) (holding that an issue not briefed on appeal is deemed waived); Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008) (same). We therefore limit our discussion of the court's finding Royal is vicariously liable for Cheung's negligence to whether the court correctly determined there was a master-servant relationship between Royal and Cheung.

independent business, . . . is not liable for the negligent acts of the contractor in the performance of the contract" is "where [the person] retains control of the manner and means of the doing of the work which is the subject of the contract"). To distinguish employees from independent contractors, the control test "'is grounded in the common law master-servant relationship'" and requires "the factfinder consider[] the extent of the employer's right to control the work of the employee." Estate of Kotsovska, ex rel. Kotsovska v. Liebman, 221 N.J. 568, 592 (2015) (quoting Lowe v. Zarghami, 158 N.J. 606, 615-16 (1999)).

To determine whether sufficient control is exercised to find a master-servant relationship, a court is required to consider the following factors set forth in the Restatement (Second) of Agency § 220:

> (1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.
>
> (2) In determining whether one acting for another is a servant or an independent contractor, the following matters of facts, among others, are considered:
>
> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

[Carter, 175 N.J. at 409-10 (quoting Restatement (Second) of Agency § 220 (Am. Law Inst. 1958)).]

Here, the court made detailed findings of fact addressing each of the factors relevant to Royal's actual control over the performance of Cheung's services and its right to control the performance of his services. On appeal, Royal does not challenge the court's factual findings, and our independent review of the record confirms the findings are supported by substantial evidence the court found credible. We defer to, and accept, each of the judge's factual

findings.  See Seidman, 205 N.J. at 169.  Included amongst those findings is the court's determination that Royal exercised almost complete control over every aspect of the services Cheung provided to his passengers.

Global's challenge to the court's order finding Royal is vicariously liable for Cheung's negligence based on their master-servant relationship is founded primarily on the contention that, in a series of cases cited by Global, other courts presented with similar circumstances have found no master-servant relationship.

We do not find Global's argument persuasive because although the cases cited by Global share some facts with those presented by the record here, this case presents different and additional facts from those presented in the cited cases.  In addition, the trial court's findings otherwise support its determination Royal not only exercised actual control, but it also had a contractual right to exercise control, over the manner in which Cheung provided services to his passengers.

For example, Global relies on Abouzeid v. Grgas, where the court determined the defendant company, which operated a "for hire vehicle base station," was not vicariously liable for the negligence of its franchisee driver who owned and operated the vehicle that was involved in an accident.  743 N.Y.S.2d 165, 166-67 (App. Div. 2002).  The court briefly cited to the trial

record, noting it showed the driver was dispatched by the company to provide the service, the driver owned the vehicle and paid all expenses related to the vehicle, and the driver set his own hours. Id. at 166.

The court found that record supported the trial court's determination the plaintiff did not allege sufficient facts to support a finding of vicarious liability based on a master-servant relationship between the company and the driver. Id. at 166-67. Importantly, the court also recognized what Global ignores here; a determination whether there is a master-servant relationship turns on the particular facts of each case. Id. at 167.

Here, the court considered the totality of many more and different facts following the trial than those before the court in Abouzeid, which was decided on a summary judgment motion record. Id. at 166. Additionally, the record in Abouzeid showed the drivers were free to reject dispatches, ibid., but Royal exercised control over Cheung by penalizing him if he did so. In Abouzeid, the drivers were free to work for other services, ibid., but the court found Royal prohibited Cheung from doing so. In Abouzeid, the drivers retained cash payments made directly to them, ibid., but the court found Royal controlled the rates and payments for Cheung's services. Thus, the court's holding in Abouzeid

A-4520-18T2

is inapposite here because it was based on wholly different facts and circumstances.

The other cases cited by Global are inapposite for the same reason. In the court's single paragraph decision in Irrutia v. Terrero, it reversed a trial court order finding the undisputed facts established a driver for a car service was an employee. 642 N.Y.S.2d 328, 329 (App. Div. 1996). The court noted the company's rules and regulations, which are not detailed or described, "related to largely incidental matters and constituted the exercise . . . of only general supervisory powers," and the court supported its determination the driver was not an employee in part because the driver "retained their own fares." Ibid.

The court's holding in Irrutia is based on a limited record and very different facts than those before the remand court here. As we have explained, the court made detailed findings based on a robust record, and it concluded Royal actually, and as a matter of fact, exercised control over the means and manner of Cheung's provision of services. The Irrutia court had no similar record before it.

Global last relies on Chaouni v. Ali, where the court found the trial court should have dismissed a complaint against a car service company, finding it could not be liable for the driver's conduct because the driver was an

independent contractor and not an employee. 963 N.Y.S.2d 27, 28 (App. Div. 2013). The court found the driver owned and paid all the costs associated with his vehicle, could select the days he worked, was free to accept or reject assignments, and could work for other "livery base stations." Ibid.

Again, the facts supporting the court's decision are more limited and different than those presented here. Cheung was not free to accept or reject assignments; he was penalized by Royal for refusing an assignment. Cheung was also not free to work for other services. In addition, the court in Chaouni noted, as indicia of the driver's status as an independent contractor, that the company did not impose hours of work or require that the driver wear a uniform, ibid., but Royal mandated Cheung cover one early morning shift per week and required he wear a uniform meeting its specifications.

In sum, the cases relied on by Global do not require a reversal of the trial court's findings or legal conclusions. Instead, they undermine Global's position because they establish that any finding of the control necessary to establish vicarious liability based on a master-servant relationship requires an analysis of the totality of the circumstances.

As we have explained, the trial court considered all the circumstances present and found Royal exercised sufficient control over Cheung to support its

31

determination they were in a master-servant relationship. We discern no basis to reverse the court's detailed findings, and Global offers none. We affirm the court's order finding Royal is vicariously liable for Cheung's negligence on that basis.

B.

Global also contends the court erred by finding Royal is vicariously liable for Cheung's negligence under the separate, but equally dispositive, doctrine of apparent authority. We reject Global's contention because substantial credible evidence supports the court's determination that Cheung drove Fontana with the apparent authority he did so on Royal's behalf. Thus, even assuming the court erred by finding there was a master-servant relationship between Royal and Cheung, Royal is vicariously liable for Cheung's negligence under the doctrine of apparent authority.

"Imputation of liability based on apparent authority prevents a principal from 'choos[ing] to act through agents whom it has clothed with the trappings of authority and then determin[ing] at a later time whether the consequences of their acts offer an advantage.'" Estate of Cordero, ex rel. Cordero v. Christ Hosp., 403 N.J. Super. 306, 312 (App. Div. 2008) (alterations in original) (quoting Restatement (Third) of Agency, § 2.03 cmt. c (Am. Law Inst. 2006)).

32

Thus, "a principal is vicariously liable for its agent's tortious conduct 'when actions taken by [an] agent with apparent authority constitute the tort . . . .'" Ibid. (quoting Restatement (Third) of Agency, § 7.08 (Am. Law Inst. 2006)).

Apparent authority "arises when a principal 'acts in such a manner as to convey the impression to a third party that the agent has certain power which he may or [may] not possess.'" LoBiondo v. O'Callaghan, 357 N.J. Super. 488, 497 (App. Div. 2003) (quoting Rodriguez v. Hudson Cty. Collision Co., 296 N.J. Super. 213, 220 (App. Div. 1997)). The doctrine of '[a]pparent authority imposes liability on the principal not as a result of an actual contractual relationship, but because the principal's actions have misled a third-party into believing that a relationship of authority in fact exists.'" Mercer v. Weyerhaeuser Co., 324 N.J. Super. 290, 317 (App. Div. 1999): accord LoBiondo, 357 N.J. Super. at 497. "[T]he doctrine generally presupposes the existence of a principal-agent relationship, [but] such a relationship is not necessary to its application." Ibid.

A claim of apparent authority requires a court determine "whether the principal has by [its] voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to

perform the particular act in question . . . ." <u>LoBiondo</u>, 357 N.J. Super. at 497

(quoting <u>Legge, Indus. v. Kushner Hebrew Acad.</u>, 333 N.J. Super. 537, 560

(App. Div. 2000)).  A party relying on the apparent authority of an agent must

establish:

> (1) that the appearance of authority has been created by
> the conduct of the alleged principal and it cannot be
> established alone and solely by proof of [conduct by]
> the supposed agent; (2) that a third party has relied on
> the agent's apparent authority to act for a principal; and
> (3) that the reliance was reasonable under the
> circumstances.
>
> [<u>AMB Prop., LP v. Penn Am. Ins. Co.</u>, 418 N.J. Super.
> 441, 454 (App. Div. 2011). (alteration in original)
> (quoting <u>Mercer</u>, 324 N.J. Super. at 318).]

"[A] court must examine the totality of the circumstances to determine whether"

the facts support a finding of apparent authority.  <u>Ibid.</u> (quoting <u>Sears Mortg.</u>

<u>Corp. v. Rose</u>, 134 N.J. 326, 338 (1993)).

Global does not dispute plaintiffs met their burden of establishing Royal

created an appearance that Cheung acted on Royal's behalf, and the evidence

overwhelmingly supports the court's finding plaintiff proved that element of

their apparent authority claim.  Indeed, Royal did all that it could to convey that

Cheung acted on Royal's behalf and with its authority.

As its president explained, Royal was in the car service business and it provided that service only through its employment of franchisees, such as Cheung. When customers called Royal to schedule the service, they were not informed it would be provided by an entity or person independent of Royal. Instead, the customers were told that a car bearing an "Executive Cars" sign and number would pick them up, and Royal's president explained the signs were also employed to enhance Royal's branding and reputation. In other words, Royal used the signage to not only let customers know that an Executive Cars's vehicle was present with a driver to provide the requested service, but also to enhance Royal's branding and business reputation. Royal intended that each car and driver be identified as being provided by Executive Cars because, in that way, it inured to Royal's business. The same message was conveyed by Royal's requirements that Cheung identify himself as being from Executive Cars, and that each customer complete an Executive Cars's voucher for the service.

Although Global concedes plaintiffs proved the appearance of Cheung's authority to act on Royal's behalf was created by Royal's conduct, see LoBiondo, 357 N.J. Super. at 497, it contends there was no evidence showing Fontana reasonably relied on Cheung's apparent authority to act on Royal's behalf. We

35

find the argument is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We add only the following brief comments.

Fontana utilized Royal's car service on occasions prior to February 24, 2010, and he again called Royal to obtain a car service for that evening. In response to his request for car service, Royal informed Fontana it would provide a vehicle and driver, and it dispatched Cheung in a vehicle with two signs Royal required he install identifying the vehicle as being from Executive Cars. The signs, which included the vehicle number Royal provided to Fontana, identified the vehicle as the one Royal informed Fontana it would send to provide the requested car service. One purpose of the signs and Royal's provision of the vehicle number to Fontana was to ensure he got into the precise vehicle Royal dispatched to provide the car service. It can be reasonably inferred Fontana entered Cheung's vehicle because it bore the signage and number Royal advised him would identify the vehicle and driver providing the requested car service. Thus, based solely on the information supplied by Royal, Fontana entered the car driven by Cheung to obtain the service Royal said it would provide. In addition, in accordance with Royal's requirements, Cheung identified himself to Fontana as being from Executive Cars, and Cheung provided Fontana with a voucher indicating the car service was provided by Executive Cars.

36

In sum, every action taken by Royal to book Fontana's car service, and all the requirements it imposed on Cheung, were for the purpose of convincing its customers that Cheung was an Executive Cars's driver providing car service on behalf of Executive Cars. Fontana requested the car service provided by Executive Cars, and Royal sent Cheung, bearing Executive Cars's signage and vouchers and announcing he was from Executive Cars's, to provide the service. Those facts amply support the court's determination Fontana reasonably relied on Cheung's apparent authority to act—that is, drive the vehicle—for Royal on February 24, 2010. That is the precise service Fontana requested Royal provide. The trial court therefore correctly determined plaintiffs proved Royal is vicariously liable for Cheung's negligence under the doctrine of apparent authority.

## C.

Global also contends that in its March 23, 2018 written decision, the court erred by finding Royal did not prevail on its initial appeal. Global asserts it prevailed on the appeal because we rejected the trial court's reasoning supporting its coverage determination and remanded for the court to determine if there was coverage under the policy under a different theory—that there was coverage because Royal is vicariously liable for Cheung's negligence. Global claims that,

since it prevailed on the appeal, under the consent judgment it has no obligation to pay plaintiffs the otherwise agreed upon $650,000, and the issue litigated in accordance with our remand order—whether Royal is vicariously liable for Cheung's negligence—is moot under the consent judgment's terms.

We again note that no issues related to the meaning of the consent judgment were presented on the initial appeal. The appeal required only a determination of whether the trial court, in the first instance, correctly determined Cheung was entitled to coverage as an insured under the policy. In addressing that issue, we were not presented with, or required to determine, any issues related to the consent judgment or the impact, if any, of our decision on the parties' agreement embodied in the consent judgment.

On remand, for the first time the court was presented with issues concerning the meaning of the consent judgment. The court issued its March 23, 2018 opinion rejecting Global's claims the consent judgment precluded further litigation of the coverage issue on remand and that Global prevailed on the initial appeal under the terms of the consent judgment.

Following issuance of the court's March 23, 2018 opinion, and the apparent dismissal of the action in the Law Division, a different judge entered an October 15, 2018 order adopting the court's March 23, 2018 findings Global

did not prevail on the appeal within the meaning of the consent judgment and the consent judgment did not preclude a determination of whether Global was required to provide coverage for Cheung's negligence because Royal was vicariously liable for Cheung's actions.

In its brief on appeal, Global argues plaintiffs' coverage claim should be dismissed pursuant to the consent judgment, or, in the alternative, Global should not be bound by the consent judgment and is entitled to litigate the issue of Cheung's negligence and damages. The arguments are premised on the assertion Global prevailed on the initial appeal under the terms of the consent judgment.

Global's claim it prevailed on the initial appeal was addressed and rejected in the court's March 23, 2018 opinion, as later adopted in the court's October 15, 2018 order. During the remand trial that followed entry of the order, there was no evidence presented concerning the parties' entry into the consent judgment.

In pertinent part, the court's final May 20, 2019 order following the remand trial provides only that the consent judgment remains in full force and effect; that Global shall pay the sums due in accordance with its "terms, conditions[,] and limitation"; and that plaintiffs shall take no action to enforce the consent judgment's terms until Global's appeals have been exhausted. The

trial court on remand did not provide any interpretation of the consent judgment or make any findings as to its meaning.

Global's arguments concerning the meaning and interpretation of the consent judgment are unrelated to the May 20, 2019 order. Global does not claim the remand trial court erred by finding the consent judgment remains in full force and effect or that it should not be enforced according to its terms. To the contrary, Global relies on the validity and effectiveness of the consent judgment for its argument that it is entitled to a dismissal of plaintiffs' coverage claim and, if not, to litigate Cheung's negligence and the issue of damages following the remand court's vicarious liability determination.

Global's challenge on appeal concerning the consent judgment is therefore limited to the court's October 15, 2018 order adopting the findings concerning the consent judgment in its March 23, 2018 opinion. We reject Global's arguments concerning the October 15, 2018 order's findings concerning the consent judgment for the following reasons.

First, Global does not appeal from the court's October 15, 2018 order. It opted to appeal solely from the court's May 20, 2019 order. Rule 2:5-1(f)(3) requires the notice of appeal "shall designate the judgment, decision, action or rule, or part thereof appealed from," and Global's notice of appeal does not

include the October 15, 2018 order.[6]  "[I]t is only the judgment or orders designated in the notice of appeal which are subject to the appeal process and review," and, therefore, Global "has no right to our consideration" of his arguments concerning the validity of the October 15, 2018 order.  1266 Apartment Corp. v. New Horizon Deli, Inc., 368 N.J. Super. 456, 459 (App. Div. 2004); see also Park Crest Cleaners, LLC v. A Plus Cleaners & Alterations, Corp., 458 N.J. Super. 465, 472 (App. Div. 2019) (explaining "[a] party's failure to seek review of cognizable trial court orders or determinations – by identifying them in the notice of appeal – is largely fatal").  For that reason alone, we reject Global's arguments challenging the court's determinations, embodied in the October 15, 2018 order, concerning the meaning and effect of the consent judgment.

Moreover, Global's arguments concerning the consent judgment appear to be a reprise of those expressly rejected by the court in the October 15, 2018 order.  Global argues the consent judgment should have been interpreted to either preclude further litigation on the vicarious liability issue following our remand or to allow Global to litigate the issues of Cheung's negligence and

---

[6]  Global's Case Information Statement on appeal also fails to identify the October 15, 2018 order as one from which its appeal is taken.

Fontana's damage following the remand. Those claims, however, were expressly rejected in the court's March 23, 2018 opinion, which was adopted by the court's October 15, 2018 order, because they were inconsistent with the consent judgment's plain language.

Even if Global had chosen to appeal from the October 15, 2018 order, its claims concerning its purported understanding of the agreement must be rejected because they are unsupported by any evidence. See R. 1:6-6. Global's argument on appeal is premised on claims it "consented to the entry of a judgment following [the court's initial coverage decision] . . . upon the belief that [p]laintiffs were waiving any other theories of liability other than [the initial trial court's] determination Cheung was an insured under the policy"; the "consent judgment did not anticipate a remand following the appeal"; and it "never intended to waive [its] right" "to try the issue of Cheung's putative negligence" "if the consent judgment did not constitute a waiver of claims on vicarious liability theories." Those assertions are untethered to any competent evidence in the record, see R. 1:6-6; see also Baldyga v. Oldman, 261 N.J. Super. 259, 265 (App. Div. 1993) (finding the purpose of Rule 1:6-6 is in part to "eliminate the presentation of facts which are not of record by unsworn statement[s] of counsel made in briefs and oral arguments"), and Global fails to

A-4520-18T2

include in the record on appeal the evidence, if any, presented to support its arguments before the remand court, <u>see, e.g.</u>, <u>Cmty. Hosp. Grp., Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, PC</u>, 381 N.J. Super. 119, 127 (App. Div. 2005) (explaining appellate courts are not "obliged to attempt review of an issue when the relevant portions of the record are not included" in the record on appeal). For those reasons, we would otherwise reject Global's arguments concerning the consent judgment if it had opted to appeal from the October 15, 2018 order in the first instance.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION